UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

BRIAN ROBERT BLAZER
D/B/A CARPENTER BEE SOLUTIONS

       Plaintiff,

v.

CHRISMAN MILL FARMS, LLC

       Defendant.

Case No. 5:17-cv-0430-DCR-REW

Filed via ECF

**AMENDED MEMORANDUM IN SUPPORT OF TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant, Chrisman Mill Farms, LLC ("Chrisman Mill Farms" or "CMF"), submits the following memorandum in support of its Motion for a Temporary Restraining Order and Preliminary Injunction.  The amendment changes an incorrect citation to RE46421 from col5: ll. 49-52 to col 5: ll. 29-32 and corrects the date of first date of an offer to sell on eBay to May 9, 2008.

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................................... 1

III.    ARGUMENT ........................................................................................................... 8

  A.    Preliminary Relief ............................................................................................. 10

  B.    The Defendant Is Likely To Succeed On The Merits Of Its Case ................................. 12

     1.    The Defendant does not infringe claims 1-12 of the '624 Patent and RE46421 ....... 13

     2.    Claims 13-21 of RE46421 are not infringed by the WOOD BEE GONE II and its claims are invalid under the "Recapture Rule" .................................................. 21

     3.    The prior art renders the claims of the '624 Patent and RE46421 invalid and unenforceable. ....................................................................................................... 22

     4.    Claims 1 and 13 are invalid for failing to meet the requirements of 35 U.S.C. § 112. ...........................................................................................................23

     5.    The '624 Patent and RE46421 are likely invalid under 35 U.S.C. § 102(a)(1).......... 26

  C.    The Defendant Is Likely To Suffer Irreparable Harm If A Preliminary Injunction Is Not Granted ........................................................................................................ 28

  D.    The Balance Of Hardships Demonstrates That Harm Is Unlikely To Befall The Plaintiff Or Others .............................................................................................................. 30

  E.    The Issuance Of A Temporary Restraining Order And Preliminary Injunction Is In The Public Interest ...................................................................................................... 31

IV.    CONCLUSION ...................................................................................................... 33

## I.    INTRODUCTION

The need for this motion arises from the anticompetitive and tortious actions of Brian R. Blazer ("Blazer") in his notification of vendors of Chrisman Mill Farms' products that he believes that the WOOD BEE GONE II carpenter bee trap infringes the claims of US Patent 8,375,624 ("the '624 patent") (ECF No. 3-1), now reissued as RE46421 ("RE46421") (Exhibit A).  Blazer's baseless allegations of infringement of the '624 Patent and RE46421 are intended only for their anticompetitive effects on the sales and goodwill of CMF as there is no good faith argument that the WOOD BEE GONE I or WOOD BEE GONE II carpenter bee trap infringes either patent. The removal of CMF's products from the marketplace has damaged and will continue to damage Chrisman Mill Farms not only from an immediate loss of sales, but will irreparably harm Defendant's reputation and goodwill among vendors, effectively and permanently removing a significant competitor of Plaintiff's from the market.

## II.    FACTUAL BACKGROUND

Chrisman Mill Farms first faced allegations of patent infringement by Blazer on December 10, 2015, when Blazer communicated those allegations to Amazon.com, Inc. ("Amazon" or "Amazon.com") and caused the original WOOD BEE GONE I carpenter bee trap removed from sale from the website www.amazon.com.   Amazon subsequently instructed CMF that the product could not be relisted without a court order of non-infringement, or the withdrawal of the allegations of infringement by Blazer.  During a meeting with Blazer during the week of December 14, 2015, the Plaintiff represented to CMF that his attorney, Joe Gleason, had determined that his WOOD BEE GONE I carpenter bee trap infringed the '624 Patent.  To avoid litigation, Chrisman Mill Farms obtained a license under the '624 Patent.  ECF No. 8-7.

CMF's license under the '624 Patent terminated on December 31, 2016.  The Defendant refused to purchase another license due to a large increase in royalties demanded by Blazer.  CMF redesigned its traps for flush mounting and removed the roof overhang over the entrance hole to remove what Blazer believed was a means to shelter the entrance to the hole.  At no point prior this controversy did Blazer claim that the hole itself was a means to shelter the entrance to the hole.  CMF has a good faith belief that it does not and has never infringed the claims '624 Patent.

CMF reached out to Blazer via e-mail on January 3, 2017 to give notice to the Plaintiff that it intended to market a carpenter bee trap that did not have a roof extending over the entrance to the hole that Blazer believed made the WOOD BEE GONE I carpenter bee trap infringe the claims of the '624 Patent.  ECF No. 8-8 (Jan. 3, 2017 e-mail).  In that e-mail, CMF supplied a drawing of the new trap and an explanation as to why it believed the trap did not infringe the claims of the '624 Patent.  In that communication, CMF requested that Blazer review the new trap before any attempts by the Defendant to manufacture or sell the product so as to avoid any misunderstandings.  CMF also requested that, in the event that Blazer believed the new trap might infringe the '624 Patent, he should indicate why he believed there was infringement and to identify the claims he believed would be infringed.  Blazer only responded with a notice that he intended to sue CMF for patent infringement, even though the new traps had not been made or offered for sale at that point.  ECF No. 8-9 (text message).

To confirm its assumption of non-infringement, CMF sought and obtained a legal opinion from a registered patent attorney.  Exhibit B (opinion letter).  That legal opinion confirms that that neither the WOOD BEE GONE I nor the WOOD BEE GONE II carpenter bee traps infringe any claims of the '624 Patent and further opined that the '624 Patent is invalid.

On or about February 7, 2017, Blazer contacted Amazon and alleged that CMF's WOOD BEE GONE II carpenter bee trap (being sold through the *www.amazon.com* website directly from the Defendant and also by Amazon Vendor Central) infringes the claims of the '624 Patent. Amazon subsequently notified CMF of the allegation from Blazer in an e-mail dated February 7, 2017. Exhibit C (Feb. 7, 2017 e-mail from Amazon). In that e-mail, Amazon indicated that attempts to relist the WOOD BEE GONE II carpenter bee trap prior to resolving the allegations of patent infringement could result in a complete revocation of CMF's selling privileges on *www.amazon.com*. In a further e-mail dated February 10, 2017, counsel for Amazon notified CMF that it would seek indemnity should the allegedly infringing product be relisted for sale on its website. Exhibit D (February 10, 2017 e-mail from Amazon). Since that time, CMF has declined to fill several Amazon's purchase orders (Exhibit E) for carpenter bee traps valued at approximately $20,000 because of the threats from Blazer.

On or about February 10, 2017, Blazer contacted Etsy, Inc. ("Etsy" or "Etsy.com") to allege that CMFs carpenter bee traps being sold through its website infringed the '624 Patent. Etsy subsequently notified CMF of the allegation from Blazer in an e-mail dated February 10, 2017. Exhibit F (Feb. 10, 2017 e-mail from Etsy). In that e-mail, Etsy further indicated that attempts to relist the WOOD BEE GONE II carpenter bee trap prior to resolving the allegations of patent infringement could result in a complete revocation of CMF's selling privileges on *www.etsy.com*.

On or about February 16, 2017, someone on Blazer's behalf contacted Bonanza.com, Inc. ("Bonanza" or "Bonanza.com") to allege that the Defendant's carpenter bee traps being sold through its website infringed the '624 Patent. Bonanza subsequently notified CMF of the allegation from Blazer in an e-mail dated February 16, 2017. Exhibit G (Feb. 16, 2017 e-mail from Bonanza). In that e-mail, Bonanza further indicated that attempts to relist the WOOD BEE

GONE II carpenter bee trap prior to resolving the allegations of patent infringement could result in a complete revocation of Chrisman Mill Farms selling privileges on *www.bonanza.com*.

On or about February 20, 2017, Blazer contacted Houzz, Inc. ("Houzz" or "Houzz.com") to allege that CMF's carpenter bee traps being sold on its website infringed his '624 Patent. Houzz subsequently notified CMF of the allegation from Blazer in an e-mail dated February 20, 2017. Exhibit H (Feb. 20, 2017 e-mail from Houzz). In that e-mail, Houzz further indicated that attempts to relist the WOOD BEE GONE II carpenter bee trap prior to resolving the allegations of patent infringement could result in a complete revocation of CMF's selling privileges on *www.houzz.com*.

There is a strong possibility that Blazer has provided notices to additional CMF vendors about which the Defendant has yet to discover. In support of the notice of infringement to Amazon, Bonanza, Etsy, and Houzz, Blazer and/or his attorney drafted and submitted a claims construction chart to identify the elements of claim 1 of the '624 Patent that were believed by the Plaintiff to be found on the WOOD BEE GONE II carpenter bee trap. ECF No. 8-10. Claim 1 of the '624 Patent and RE46421 claims:

A carpenter bee trap comprising:

a trap entrance unit forming a plenum being made of wood or a wood substitute;

said trap entrance unit having at least one hole drilled there-through and sized to mimic a natural carpenter bee nest tunnel so as to provide a primary attractant;

said hole extending from the outside of the trap unit to a plenum interior; said hole being configured to extend substantially horizontally or at an upward angle;

a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light;

said trap unit further comprising a receptacle adapter being substantially located at the bottom of said trap unit and being configured to receive a clear or translucent receptacle;

4

a receptacle received by said adapter situated to allow ambient light to enter through said bottom into said plenum interior, thereby providing a secondary attractant;

said receptacle further being provided to receive trapped bees.

Emphasis added.  ECF No. 3-1, col. 7: l. l8 – col. 8: l. 3.  The Plaintiff's initial claims construction chart includes the following image (Figure A) in mapping the application of claim elements to the WOOD BEE GONE II carpenter bee trap.  ECF No. 8-10, p. 2.

**FIGURE A**

Figure 1



Blazer's initial infringement allegations put forth in his claim construction chart to Amazon explicitly requires "a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light" and identifies that claim element as "[1c]" in the chart and element "A" on Figure

5

1.  ECF No. 8-10.  Blazer applied the language of claim 1 of the '624 Patent to the WOOD BEE GONE II carpenter bee trap and disingenuously proclaimed that "[t]he roof of the plenum extends slightly past to shelter the entrance, thereby reducing the amount of ambient light entering the plenum."  ECF No. 8-10, p 2.  Despite the allegations of the Plaintiff, it can be clearly seen from Figure 1 of Blazer's initial infringement contentions to Amazon that the roof does not extend out to shelter the entrance and the leading edge of the roof is unmistakably flush with the face of the trap.  Blazer's allegation that the roof extended over the entrance to the hole was unquestionably false and intended to tortiously interfere with CMF's sales.

Blazer, after succeeding in getting CMF's products delisted from Amazon, amended his infringement contentions regarding the WOOD BEE GONE II.  ECF No. 3-4.  As shown below in Fig. B, the amended contentions differ in that they no longer allege that the WOOD BEE GONE II possesses a "means to shelter the entrance" to the hole, but instead alleges that the device roof and inclined entrance hole "shelter the entrance hole."  Exhibit M.  In a failed attempt at being clever and amending an obvious lie with a less obvious play on words, Blazer intentionally avoids using the language of the claim which calls for "a means to shelter the entrance to said hole…", not a sheltered entrance hole.  The distinction being that the claim specifically calls for the entrance to the entrance hole to be sheltered, not the entrance hole itself.  Thus, Blazer's infringement contentions fail to even allege that the WOOD BE GONE II meets all of the limitations of claim 1 of the '624 Patent and RE46421, i.e. a means to shelter the entrance to the hole.

**FIGURE B**
**Plaintiff's WOOD BEE GONE II Infringement Contentions**

| Original Infringement Contention | Current Infringement Contention |
|---|---|
| As shown above in Figure 1, the Chrisman Mill Farms LLC carpenter bee trap has a hole extending from outside surface into the interior of the plenum (arrow B). This hole is oriented at an upwards angle (arrow B). The roof of the plenum extends slightly past to shelter the entrance, thereby reducing the amount of ambient light entering the plenum (arrow A). | As shown above in Figure [2], the "Wood Be Gone II" carpenter bee trap has a hole extending surface into the interior of the plenum (arrow B). This hole is oriented at an upwards angle (arrow B). The upwards angle of the hole and the opaque roof of the plenum shelter the entrance hole, and reduce the amount of ambient light entering the plenum (arrow A), much like the roof of the preferred embodiment depicted in Figs. 5a, 5b and 5c of the '624 Patent, in which the trap entrance is made from a solid block of wood having neither an overhanging roof nor sloping sides. Plaintiff notes that Figs. 5a-c each depict entrance holes 511, which are described in the specification of the '624 Patent as "sheltered entrance holes." '624 patent, col. 6, ll. 30-34. |

RE46421 replaces the '624 Patent and subsumes its content and adds claims 13-21, with claim 13 being the only independent claim. Claim 13 states as follows:

A carpenter bee trap, comprising

a trap entrance unit formed of wood or a wood substitute, wherein at least one side of the trap entrance unit has at least one entrance hole that extends from outside the trap entrance unit to an interior of the trap entrance unit, wherein the at least one entrance hole extends substantially horizontally or at an upward angle with a size and shape configured to provide a primary attractant for carpenter bees, and wherein the trap entrance unit further comprises an exit opening for providing an exit path from the interior of the trap entrance unit;

and a receptacle adapter located at the exit opening of the trap entrance unit, wherein the receptacle adapter is adapted to receive at least one receptacle and is adapted so as to allow at least some ambient light to enter the interior of the trap entrance unit via the exit opening, thereby providing a secondary attractant for carpenter bees.

See Exhibit A, col. 8: ll. 24-41.

The '624 Patent issued from U.S. Patent Application 12/430,148 (the " '148 Application"), whose prosecution history is attached hereto as ECF. No. 18-2.  On or about October 9, 2012, claim 1 of the '148 Application was amended during prosecution to add the restriction, i.e. claim element, "a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light."  Exhibit I ('148 Application - October 9, 2012 Examiner's Amendment).

RE46421 is the broadening reissue of the '624 Patent and was prosecuted as U.S. Patent Application 14/624,478 (the " '478 Application").  The '478 Application included new claims 13-21.  The '478 Application was amended via a Supplemental Reply to recapture claim scope that was previously surrendered during prosecution of the '624 Patent through the narrowing of claim 1 via the Examiner's Amendment of October 9, 2012.  Exhibit J (Supplemental Amendment of March 23, 2017).  New independent claim 13 of RE46421 is broader than claim 1 because it omits the restriction, i.e. claim element, "a means to shelter the entrance to said hole is provided to reduce the admittance of ambient light" found in independent claim 1 of the '624 Patent.  In claim 13, unlike claim 1, there is no claim element requiring the sheltering of the entrance to the entrance hole.  Moreover, claim 13 was also amended to remove the limitation of *reducing the admittance of ambient light*.  Exhibit J, page 8 (Remarks, ¶2).

## III.    ARGUMENT

The actions of Blazer have necessitated the filing of this motion for a temporary restraining order and preliminary injunction to restore the status quo.  As shown above, Blazer has made false allegations that Chrisman Mill Farms' WOOD BEE GONE II carpenter bee trap infringes his '624 Patent and RE46241.  These allegations were made to the CMF's largest customer, Amazon, and to online vendors Bonanza, Etsy, and Houzz.  The sale of the WOOD BEE GONE II carpenter bee

trap to and through these companies represented a significant majority of Chrisman Mill Farms revenue.  As demonstrated below, the Plaintiff's allegations of infringement are demonstrably false and Chrisman Mill Farms will likely succeed on the merits of its causes of action seeking a declaration of non-infringement and patent invalidity.

Infringement allegations are objectively baseless if "no reasonable litigant could realistically expect success on the merits." *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1370 (Fed. Cir. 2008), *quoting Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49, 60 (1993).  Chrisman Mill Farms establishes its entitlement to a temporary restraining order and a preliminary injunction below by demonstrating that it (1) possesses a likelihood of success, (2) that it will likely suffer irreparable harm should the preliminary relief not be granted, (3) that the balance of hardships tilts in the favor of Chrisman Mill Farms because Blazer is unlikely to be significantly harmed by the granting of preliminary relief since the Plaintiff has little likelihood of success and can be compensated with an award of damages or a royalty should he succeed on the merits, and (4) the granting of preliminary relief does not impair the public interest.

Chrisman Mill Farms readily demonstrates herein that claim 1, should it be found to be valid, is not infringed because the WOOD BE GONE II carpenter bee trap clearly lacks the claim element "a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light" as required in claim 1.  Exhibit A, col. 7: ll. 51-51.  That claim 1 is most likely invalid as being indefinite, lacking enablement, or lacking a sufficient support in the written description under 35 U.S.C. § 112.  That claim 13 of RE46421 is clearly invalid for violating the recapture rule and reclaiming claim scope surrendered during patent prosecution, i.e. claim 13 no longer requires a "means to shelter the entrance to said hole."  "Under the rule against recapture, a patentee's reissue claims are invalid when those claims were broadened to include subject matter

9

that the patentee previously surrendered during prosecution of the original patent. Thus, a patentee is precluded from regaining the subject matter that he surrendered in an effort to obtain allowance of the original claims." *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1263 (Fed. Cir. 2012).

Blazer's purpose in issuing notices alleging that the WOOD BEE GONE II carpenter bee trap infringed the '624 Patent was not to provide objective information to enforce its patent, but was a tactic in his efforts to achieve an unfair competitive advantage by providing notices of infringement which contained objectively and subjectively baseless allegations of infringement. An injunction prohibiting the future communication of notices of infringement and withdrawal of preexisting notices of infringement, via a mandatory injunction, is appropriate when the allegations are made in bad faith and the general considerations justify the grant of an injunction. *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891 (Fed. Cir. 1998) (preliminary injunction denied because movant only showed no more than a negligible likelihood of success in showing bad faith in communication of infringement notices and there was no strong showing of irreparable injury or that the balance of harms strongly favored the movant). The balance of equities and the underlying bad faith of Blazer strongly support the issuance of a temporary restraining order and preliminary injunction.

### A. Preliminary Relief

The purpose of a temporary restraining order is to preserve the status quo until court has an opportunity to rule upon merits of a demand for a preliminary injunction. *Pan American World Airways, Inc. v. Flight Engineers' International Assoc.*, 306 F2d 840 (2nd Cir. 1962; *Jews for Urban Justice v. Wilso*n, 311 F.Supp 1158 (D.D.C. 1970); and *Palmigiano v. Travisono*, 317 F.Supp 776 (D.R.I. 1970).

The purpose of a preliminary injunction is to preserve and/or restore the status quo pending the outcome of litigation. *Porter v. Lee*, 328 U.S. 246, 251 (1946); *United States v. White County*

10

*Bridge Com.,* 275 F.2d 529 (7th Cir. Ill. 1960); and *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993).  The status quo is the status which preceded the pending controversy between these parties.  *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958); and *GoTo.com v. Walt Disney Co*., 202 F.3d 1199, 1210 (9th Cir. 2000).  Restoring the status quo requires the removal of the Plaintiff's interference with Defendant's sales of its goods to third parties.  In evaluating requests to issue preliminary injunctive relief under Fed. R. Civ. P. 65(a),

> district court[s] must consider and balance: (1) the [defendant's] likelihood of success on the merits; (2) whether the [defendant] may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest.

*Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006) (internal quotations omitted), *quoting Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Co.*, 274 F.3d 377, 400 (6th Cir. 2001) *cert. denied*, 535 U.S. 1073 (2002). These considerations "are factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe, MI*, 341 F.3d 474, 476 (6th Cir. 2003), *citing In re Delorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).  When considering and balancing these factors, "[t]he Court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix." *In re Eagle-Picher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir. 1992).

The Defendant acknowledges that the granting of a preliminary injunction is an extraordinary remedy.  *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1578 (Fed. Cir. 1990).  However, as demonstrated below, CMF satisfies all of the criteria for the issuance of a preliminary injunction: 1) it can establish a substantial likelihood of success on the merits because the Plaintiff's infringement contentions are clearly false; 2) an injunction is necessary to prevent immediate, ongoing and irreparable harm to the Defendant that could not only destroy

Chrisman Mill Farms reputation and goodwill, but will likely put CMF out of business; 3) the issuance of an injunction is highly unlikely to harm the Plaintiff or others but merely return things to the status quo; and 4) there is no adverse impact upon the public interest in the issuance of an injunction in this case because (i) the public has an interest in preventing a patentee from improperly expanding the scope of his patent beyond the grant of patent rights, and (ii) because there is clearly an interest in preserving fair competition in the marketplace.

Accordingly, the Court should issue a temporary restraining order to prevent further damage to CMF, and, after a hearing, issue a preliminary injunction to maintain the status quo pending a final adjudication of this dispute.

### B.     The Defendant Is Likely To Succeed On The Merits Of Its Case

The 1st Circuit has held that the probability of success is "the critical factor in determining the propriety of injunctive relief." *Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1st Cir. 1985).   To obtain a preliminary injunction, Chrisman Mill Farms only needs to demonstrate a mere "probability of success" that it can show that it does not infringe any valid claim of the '624 Patent and RE46421.  *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968), *citing H.E. Fletcher Co. v. Rock of Ages Corp.*, 326 F.2d 13 (2d Cir. 1963).  As shown below, Chrisman Mill Farms can demonstrate a strong likelihood of success in showing that the WOOD BEE GONE II does not infringe any claim of the '624 Patent and RE46421 and that the independent patent claims are invalid.

Determination of the issue of literal infringement involves the steps of first construing the claims and then applying the construed claims to the accused device. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 539-40 (Fed. Cir. 1998).  In making an allegation of patent infringement, the burden of proof rests on the patentee to "show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents." *Liquid Dynamics Corp*. v.

*Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004), *citing Deering Precision Instruments, L.L.C*. v. *Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003).

When assessing patent infringement, the United States Court of Appeals for the Federal Circuit has instructed federal trial courts first to determine "the scope and meaning of the patent claims asserted." *Cybor Corp*. v. *FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998).  The words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  A patentee must establish "equivalency on a limitation-by-limitation basis" by "particularized testimony and linking argument" as to the insubstantiality of the differences between the claimed invention and the accused device or process. *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566 (Fed. Cir. 1996).

### 1.    The Defendant does not infringe claims 1-12 of the '624 Patent and RE46421

Here, the patentee has asserted that the WOOD BEE GONE II literally infringes claim 1. The WOOD BEE GONE II carpenter bee trap does not have, and has never had, a means to shelter the entrance to a hole which is provided to reduce the admittance of ambient light.

As previously discussed, claim 1 of the '624 Patent and RE46421 includes the limitation that an infringing device must possess "a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light." Exhibit A, col. 7, ll. 50-51.  To understand the claim element "means to shelter an entrance to said hole," the terms and phrases "hole", "entrance to said hole", and "shelter" must be construed.  "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.  The Defendant has proposed constructions for these terms and phrases.  Exhibit

K.  The Plaintiff has not offered any proposed construction of a "means to shelter the entrance to said [entrance] hole" and has generally refused to participate in the claims construction, but has identified structures in the patent that the Plaintiff believes could constitute a *means to shelter an entrance to said hole*.   Exhibit L (Plaintiff's Initial and Supplemental Preliminary PR 4-2 Disclosure).

Regarding the "hole", claim 1 states "said trap entrance unit having at least one hole drilled there-through and sized to mimic a natural carpenter bee nest tunnel." Exhibit A, col. 7: ll. 44-46. Claim 1 clearly indicates that the "hole" is the void leading into the trap from the trap face, so there is no need to further construe the term "hole." Moreover, the specification supports that construction by describing the "entrance hole" as being the passageway into the trap's plenum. Exhibit A, col. 4: ll. 59-60.   The phrase "entrance to said hole" in claim 1 is also used in its ordinary meaning, which is widely understood by all to be orifice through which access to the hole is achieved, the referenced hole being the entrance hole.  Therefore, the meaning of the phrase "entrance to said hole" requires no further construction, it is simply the entrance to the entrance hole.  The term "shelter" is also used according to its ordinary meaning as a structure that protects. Since claim 1 requires the "shelter" to reduce the admittance of ambient light into the plenum through the entrance hole (Exhibit M, p. 2), an infringing device must possess a structure which can accomplish this task.  Both parties are in agreement that the claim element "a means to shelter an entrance to said hole" is a means plus function claim governed by 35 U.S.C. § 112(f).  See Exhibit K and Exhibit L.

When a means-plus-function claim is to be construed "1) the court must first identify the function of the limitation; and 2) the court must then look to the specification and identify the corresponding **structure** for that function. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946,

950 (Fed. Cir. 2007) (emphasis in the original), *citing Med. Instrumentation & Diagnostics Corp.*

*v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003).  The function of the "means to shelter the

entrance to said hole" is provided by claim 1 itself when it states that the means to shelter the

entrance to said hole "is provided to reduce the admittance of ambient light."  Exhibit A, col. 7, ll.

50-51.  The only structure identified in the patent specification that could potentially act as a

"means to shelter the entrance to said hole" which is "provided to reduce the admittance of ambient

light" from entering the entrance hole is a roof overhanging the entrance to the entrance hole.

The "hole" of Blazer's claim chart element [1c] is identified as the hole in the front face of

the trap and is identified by Blazer's use of arrow B in Figure 1 above, and described as such in

his discussion of element [1b] in his claims construction chart:

> As shown above in Figure 1, the Chrisman Mill Farms LLC
> carpenter bee trap has at least one hole drilled though the wall of the
> trap entrance unit, and the hole is roughly one-half inch in diameter,
> which is designed to allow carpenter bees to pass through and mimic
> a carpenter bee nest (arrow B).

ECF No. 3-4.

As indicated in specification of the patents-in-suit, the only "means to shelter the

**entrance** to said hole" is the roof which "overhangs and provides added shelter for at least one

entrance hole."  Exhibit A, col. 2: ll. 49-51 (emphasis added).  The purpose of the "means to

shelter…" is also made clear, "to prevent ambient light from **directly** entering the entrance

hole."  Exhibit A, col. 5: ll. 29-32 (emphasis added).

Blazer identifies the following as corresponding structures under 35 U.S.C. § 112(f) to a

"means to shelter an entrance to said hole is provided to reduce the admittance of ambient light":

- the roof (element 161) of patent Figs 1A-1B;

- the entrance hole (element 11) of patent Figs. 1A-B;

15

- the roof (element 261) of patent Figs. 2A-2C;

- the entrance hole (element 21) of patent Figs. 2A-2C;

- the solid block wood body (element 3) of patent Figs. 3A-3D;

- the entrance hole (element 31) of patent Figs. 3A-3D;

- the angled end surfaces of the trap entrance unit in patent Figs. 4A-4B;

- the solid wooden block body of patent Figs. 5A-5C; and

- the entrance holes 511 of patent Figs. 5A-5C.

### a)   The entrance hole or its slope cannot be a means to shelter the entrance to itself.

Blazer's principal argument for infringement is that the entrance hole is the "means to shelter the entrance to said [entrance] hole…" because the slope of the hole itself keeps light from entering the plenum.  Given that a hole is a void, in this case a passageway through the outer wall of the trap plenum, it is impossible for the entrance hole to shelter anything, much less the entrance to the void itself.  Even if the hole is interpreted as the surrounding wall of a tunnel through something, an interpretation with which the Defendant would strenuously disagree.  The hole, by definition, starts at its entrance. Since the hole begins and inclines at or after the entrance, its slope is completely unrelated to the amount of light passing through that entrance and no feature of the hole could act as a means to shelter the entrance to the hole.  See Figure C.  Since the entrance hole lies past the entrance and not between the entrance and the light source, it is simply a physical impossibility for the entrance hole or its slope of the hole to shelter the entrance to the entrance hole so as to reduce the admittance of light.  The Defendant's products do not infringe claim 1 under Plaintiff's flawed argument that the entrance hole is the "means to shelter the entrance to said [entrance] hole…".

**FIGURE C**



### b) The body of the trap cannot be the means to shelter the entrance to the entrance hole.

Blazer's argument that the body of the WOOD BEE GONE II can be a means to shelter the entrance to the entrance hole is also demonstrably false. The Plaintiff's argument that patent Figs. 5A-5C demonstrate that the body of a carpenter bee trap is a "means to shelter the entrance to said hole to reduce the admittance of ambient light" is clearly incorrect because the side entry holes (element 511) of patent Figs. 5A-5C identified by Blazer as being the means to shelter the entrance to the entrance hole all lack any structure to prevent light from reaching the entrance to the entrance holes as is demonstrated by patent Fig. 5A-C. Exhibit A, Figs. 5A-5C. Further, patent Fig. 5B, reproduced below with patent Fig. 4A (Fig. D), clearly demonstrates that there is no sheltering structure between the entrance to the identified holes (511) and any potential source of light.

The Plaintiff is asking the Court to ignore the fact that the patent fails to disclose any trap body with a structure that lies between the entrance to the entrance hole and a light source, except possibly for a roof overhanging an entrance.  For a trap body to shelter the entrance to the entrance hole so as to prevent light entering the entrance hole, it would need a structure that comes between the ambient light and the entrance.  This configuration is neither shown in the drawings nor described in the specification.  Moreover, it would defeat the purpose of the trap because the hole would not be visible or likely even accessible to the carpenter bee.  Regardless, neither the WOOD BEE GONE trap nor the WOOD BEE GONE II trap possess a trap body which would cover the entrance to the hole, therefore the body of CMF's trap does not function to shelter the entrance to the entrance hole so as to reduce the admittance of light.  The Defendant's products do not infringe claim 1 under Plaintiff's flawed argument that the body of the trap itself shelters the entrance to the entrance hole from light.

**FIGURE D**

Patent Fig. 4A

Patent Fig. 5B



18

### c)     The roof overhanging the entrance to the hole cannot reduce the admittance of light.

It is arguable that the roof (element 161) of Figs 1A-1B, the roof (element 261) of patent Figs. 2A-2C, the solid block of wood of patent Figs. 3A-3D, and the angled end surfaces of the trap entrance unit in Figs. 4A-4B could provide a "means to shelter the entrance to said hole…" because there are structures directly above the entrances to the holes.  However, the disclosed roofs which are described as being able to reduce the admittance of ambient light into the plenum through the entrance hole cannot perform that function since the purpose of the means to shelter is to prevent light from directly passing through the entrance hole and into the plenum.[1]  The angle of approach that a direct beam of light would have to follow in order to pass into the plenum through the entrance to the hole and thus be seen by a carpenter bee is limited by the length of the hole and the angle of inclination.  As demonstrated below in Fig. E, only a relatively small angle of entry, i.e. Θ, into the hole is possible such that it would permit light to pass from outside of the trap into the interior, i.e. plenum, because light travels in a straight line.  As shown below, an overhanging roof such as found on the WOOD BE GONE I carpenter bee trap cannot prevent light from passing into the plenum through a substantially horizontal or inclined hole.

---

[1] The patentees state in the patent specification that the purpose of the "means to shelter…" is "to prevent ambient light from **directly** entering the entrance hole and bees within the trap will not identify the entrance hole as an exit." Exhibit A, col. 5: ll. 29-32 (emphasis added).

**FIGURE E**



### d)   The doctrine of equivalents is inapplicable to the "means to shelter…" claim element

There are no equivalent structures available under the Doctrine of Equivalents.  Equivalent but undisclosed structures that could be considered a "means to shelter the entrance to said hole" are not within the scope of claim 1.  The Doctrine of Equivalents is not applicable to the claim element "a means to shelter the entrance to said hole" because of prosecution history estoppel, therefore there can be no equivalent structure on any carpenter bee trap to shelter the entrance to the hole apart from what is disclosed in the patent specification.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733-34 (2002).  An amendment during prosecution which narrowed a claim necessarily "recognized and emphasized the difference between the two phrases[,] . . . and the difference which [the patentee] thus disclaimed must be regarded as material." *Id* at 734, *citing Exhibit Supply Co.* v. *Ace Patents Corp.,* 315 U.S. 126, 136-137(1942).  "A rejection indicates that the patent examiner does not believe the original claim could be

patented. While the patentee has the right to appeal, his decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim. *Festo* at 734, *citing Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 228 (1880).

The Defendant believes that it has demonstrated that it is very likely to succeed in proving that the WOOD BEE GONE II carpenter bee trap does not infringe the claims 1-12 of the '624 Patent and RE46421.

### 2.    Claims 13-21 of RE46421 are not infringed by the WOOD BEE GONE II and its claims are invalid under the "Recapture Rule"

It is well established that a patentee may not "regain [ ] through reissue the subject matter that he surrendered in an effort to obtain allowance of the original claims." *In re Clement*, 131 F.3d 1464, 1468 (Fed. Cir. 1997); *see also Mentor Corp. v. Coloplast, Inc*., 998 F.2d 992, 995 (Fed. Cir. 1993).  "Under this **rule** against **recapture**, 'claims that are broader than the original patent claims in a manner directly pertinent to the subject matter surrendered during prosecution are impermissible.'" *In re Mostafazadeh*, 643 F.3d 1353, 1358 (Fed. Cir. 2011), quoting *Clement*, 131 F.3d at 1468 (internal citation and quotation marks omitted).  "Whether the claims of a reissue patent violate 35 U.S.C. § 251, and thus are invalid, is a question of law []." *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*., 415 F.3d 1335, 1349 (Fed. Cir. 2005).

"Application of the recapture rule is a three step process." *Clement*, 131 F.3d at 1468; *see also N. Am. Container*, 415 F.3d at 1349; *Pannu v. Storz Instruments, Inc*., 258 F.3d 1366, 1371 (Fed. Cir. 2001). "The first step is to 'determine whether and in what "aspect" the reissue claims are broader than the patent claims.'" *Clement*, 131 F.3d at 1468. "[A] reissue claim that deletes a limitation or element from the patent claims is broader" with respect to the modified limitation. *Id*. In the second step, the court must "determine whether the broader aspects of the reissue claims

relate to surrendered subject matter." *Id*. at 1468-69. "To determine whether an applicant surrendered particular subject matter, we look to the prosecution history for arguments and changes to the claims made in an effort to overcome a prior art rejection." *Id*. at 1469.

In the third step, the court must "determine whether the surrendered subject matter has crept into the reissue claim." *Id*.  "In discussing this third step, it is important to distinguish among the original claims (i.e., the claims before the surrender), the patented claims (i.e., the claims allowed after surrender), and the reissue claims." *In re Mostafazadeh*, 643 F.3d 1353, 1358 (Fed. Cir. 2011).  "Violation of the rule against recapture may be avoided under this final step of the analysis if the reissue claims 'materially narrow' the claims relative to the original claims such that full or substantial recapture of the subject matter surrendered during prosecution is avoided. *Id* at 1358-59, *citing N. Am. Container*, 415 F.3d at 1349; *see also Pannu*, 258 F.3d at 1371; *Clement*, 131 F.3d at 1470.  "To avoid violation of the rule against recapture in this way, the narrowing must relate to the subject matter surrendered during the original prosecution (i.e., the applicant cannot recapture the full scope of what was surrendered)." *In re Mostafazadeh*, 643 F.3d at 1359, *citing N. Am. Container*, 415 F.3d at 1350; *Pannu*, 258 F.3d at 1372; *Clement*, 131 F.3d at 1471.

The Defendant believes that it has more than adequately demonstrated that claims 13-21 of RE46421 are invalid for violating the recapture rule and cannot be infringed.

### 3.    The prior art renders the claims of the '624 Patent and RE46421 invalid and unenforceable.

The Defendant has provided a detailed analysis of its invalidity contentions in its PR 3-3 and 3-8 Disclosures.  Exhibit N.  Neither the '624 Patent nor RE46421 were examined against the disclosures of the Pazik reference (Exhibit O, US Publication 2004/0231228) or the Page

reference[2] (Exhibit P).  There is both a reason to combine Pazik and Page with Warner (Exhibit Q, US Patent 5231792) and Windsor (Exhibit R, US Patent Pub. 2008/0052982 A1) in that their combination makes the device more attractive to carpenter bees as is a stated objective of the Plaintiff's patents.  The combined prior art references disclose each and every claim element of the claims in the Patents-in-Suit that are alleged to be infringed.  Exhibit N, pp. 3-8.

CMF believes that it has demonstrated that it is likely to succeed in proving that the claims of the Patents-in-Suit that it is accused of infringing are invalid and thus unenforceable.  If the claims of the Patents-in-Suit are invalid, and thus unenforceable, the Plaintiff has no right to interfere with sales of the WOOD BEE GONE II carpenter bee trap and the purpose of a temporary restraining order and preliminary injunction that restores the status quo ante is justified.

### 4.     Claims 1 and 13 are invalid for failing to meet the requirements of 35 U.S.C. § 112.

The Defendant has also shown that both independent claims and many of the dependent claims are invalid for lacking enablement or an adequate written description under 35 U.S.C. §112(a) or are indefinite under 35 U.S.C. §112(b), as demonstrated in its Preliminary Invalidity Contentions.

To meet the written description requirement of 35 U.S.C. § 112(a), the description must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed."  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).  "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id*. "For generic claims, we have set forth a number of factors for evaluating the adequacy of the

---

[2] The Page reference is a technical article that describes the well-known habit of bees and other insects to be drawn to light.

disclosure, including 'the existing knowledge in the particular field, the extent and content of the

prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue.'"

*Id.*, quoting *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005).

Also, 35 U.S.C. § 112(b) "requires that a patent specification 'conclude with one or more

claims *particularly pointing out and distinctly claiming* the subject matter which the applicant

regards as [the] invention.'" *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124

(2014), *quoting* 35 U. S. C. § 112, ¶2 (now 112(b)) (emphasis in the original). "[A] patent is

invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and

the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the

scope of the invention." *Id*. "A lack of definiteness renders invalid 'the patent or any claim in

suit.'" *Id*. at 2125, *quoting* 35 U.S.C. § 282,¶2(3).

> It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc*. To tolerate imprecision just short of that rendering a claim "insolubly ambiguous" would diminish the definiteness requirement's public-notice function and foster the innovation-discouraging "zone of uncertainty," *United Carbon*, 317 U. S., at 236, 63 S. Ct. 165, 87 L. Ed. 232, against which this Court has warned.

*Id. at* 2130.

For example, the term "wood substitute" in claims 1 and 13 has no definition or description

in the specification and is only found in the claims. "[G]enerally, generic claims are invalid where

so broadly drawn as to include compositions which do not produce stated result." *Helene Curtis*

*Indus. v. Sales Affiliates, Inc.*, 121 F. Supp. 490, 503-04 (S.D.N.Y. 1954).

The patentees make efforts discuss the types of wood that the carpenter bee prefers and

indicate that the choice of material is an attractant for the bee. Exhibit A, col. 1, ll. 49-59; and col.

4, l. 66 – col. 5, l. 2. The specification does call for the use of "solid block of wood or a similar

material" without any discussion of what properties a similar material would possess to make it

24

similar to a solid block of wood or even required to be attractive to a carpenter bee. Exhibit A, col. 3, ll. 45-46. Notably, since the purpose of the trap is to divert the carpenter bee away from the wooden structure and fool it into using the trap instead, there must be some property of interest to the bee other than the trap being a solid object with a hole. The choice of material for a wood substitute seems to be an important choice in such an environment.

It has been held that a "[p]atentee could not have claimed exclusive use of whole [ ] class particularly when it was not shown that all its members had common quality rendering each useful in same way." Chipman Chemical Engineering Co. v Reade Mfg. Co. 62 F2d 430, 431 (3rd Cir. 1932); American Chemical Paint Co. v Firestone Steel Products Co. (1941, CA6 Ohio) 117 F2d 927, 48 USPQ 405.

> Single species can rarely, if ever, afford sufficient support for generic claim; although decisions do not fix any definite number of species which will establish completion of generic invention, it is evident that such number will vary, depending on circumstances of particular cases; thus, in case of small genus such as halogens, consisting of four species, reduction to practice of three, or perhaps even two, might serve to complete generic invention, while in case of genus comprising hundreds of species, considerably larger number of reductions to practice would probably be necessary.

*In re Shokal*, 44 CCPA 854, 242 F2d 771, 113 USPQ 283 (1957). Also:

> a sufficient description of a genus instead requires the disclosure of either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can "visualize or recognize" the members of the genus. *Id*. at 1568-69. We explained that an adequate written description requires a precise definition, such as by structure, formula, chemical name, physical properties, or other properties, of species falling within the genus sufficient to distinguish the genus from other materials. *Id*. at 1568 (quoting *Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed. Cir. 1993)). We have also held that functional claim language can meet the written description requirement when the art has established a correlation between structure and function. *See Enzo*, 323 F.3d at 964 [**39] (quoting 66 Fed. Reg. 1099 (Jan. 5, 2001)). But merely drawing a fence around the outer limits of a purported genus is not an adequate substitute for describing a variety of materials

25

constituting the genus and showing that one has invented a genus and not
just a species.

*Ariad Pharm., Inc.* at 1350.

Unless the description provides some insight into what materials are acceptable as a wood
substitute or someone skilled in the art would know what non-wood materials could be substituted
in place of the wood that would attract a carpenter bee more than the wood structure it is defending,
the claim term "wood substitute" fails under written description or is insolubly ambiguous and
thus indefinite.

It has also been determined that claim 13's claim element "receptacle adapter…is adapted
so as to allow at least some ambient light to enter the interior of the trap entrance unit via the exit
opening" renders claim 13 of RE46421 invalid for lacking enablement or an adequate written
description under 35 U.S.C. §112(a) or as indefinite under 35 U.S.C. §112(b) since there is no
description of any structure in the specification that could perform this function.

5.     **The '624 Patent and RE46421 are likely invalid under 35 U.S.C. § 102(a)(1).**

The filing date of the Patents-in-Suit is April 27, 2009.  If the Plaintiff sold, offered to sell,
or otherwise publicly disclosed the invention more than before the filing date of the first filed
patent application, he would not be entitled to a patent pursuant to 35 U.S.C. § 102(a)(1) unless
that disclosure occurred less than 1 year before the filing date.  35 U.S.C. § 102(b)(1).

In this matter before the Court, the Plaintiff was required to provide all evidence related to
the conception, reduction to practice, and first sale of the invention pursuant to PR 3-2.  The
Plaintiff has been either unwilling or unable to produce any evidence of the conception or reduction
to practice of the device, but has provided evidence of what it claims is the first sale approximately
4 weeks after the start of the one year grace period under 35 U.S.C. § 102(b)(1).  The Plaintiff
would have this Court believe that he (in Alabama) and his brother (in North Carolina) co-

conceived the invention and reduced the invention to practice without creating any physical evidence of those events and subsequently offered the first device for sale on eBay on May 9, 2008.  Yet Blazer, in his July 23, 2008 *YouTube* video entitled "Why Carpenter Bees Bother Me", describes the years of research that went into developing the invention, which would presumably entail using the traps in the outdoors in full view of the public.   See https://www.youtube.com/watch?v=LdsMRhzNb3w.  Even the specification of the patents-in-suit acknowledges that patentees engaged in "extensive experimentation using prototype traps around infested structures," (see Exhibit A, col. 4: lines 52-55) yet absolutely no prototype traps, drawings, images, or other evidence of such experimentation have been produced by the Plaintiff.  Additional mentions of such experimentation are found in the specification.  Exhibit A, col. 5: ll 52-55; and col. 7: ll. 7-11.

Unfortunately, we may never know when Blazer's first public disclosure or sale of his invention was because all of the web-based e-mails from his Earthlink e-mail account were recently deleted, apparently after discovery was served, and his computer simultaneously suffered a malfunction which the Plaintiff claims may result in the complete loss of evidence from his computer's hard drive.

Coupled with the lack of evidence of the conception and reduction to practice of the invention prior to filing the patent application, the destruction of evidence from two different sources at the same time appears to be more than an unfortunate coincidence and his failure to preserve that evidence demonstrates that there was likely evidence of a public disclosure that would invalidate the patents. A spoliation instruction is likely to result which would create a negative inference as to the lack of evidence as to the first public use or attempt to sell.  This

27

negative inference would likely result in a finding that the Plaintiff's patent is invalid under 35 U.S.C. §102.

### C.    The Defendant Is Likely To Suffer Irreparable Harm If A Preliminary Injunction Is Not Granted

CMF is likely to suffer irreparable harm from the loss of reputation and goodwill, as well as face economic ruin if it is not able to sell its non-infringing products.  It has already suffered greatly and had to lay off its employees.  The majority of its annual revenue is generated by sales of carpenter bee traps sold online.  The sales of carpenter bee traps to Amazon, Etsy, Houzz, and Bonanza alone were in excess of 70% of CMF's total sales.  Exhibit S, ¶19 (Robinson Decl.). Further, Blazer's efforts to remove these products from the market will likely have an irreparably damaging effect on Chrisman Mill Farms good will and reputation because no vendor wants to risk being named to a patent infringement lawsuit.  For example, Amazon's apprehension is well founded because Blazer has previously sued Amazon for selling his competitors' bee traps.

The use of patent enforcement threats against vendors has been found to cause irreparable injury to a declaratory judgment plaintiff and to be subject to a preliminary injunction where that party may win declaratory judgment of non-infringement.  *T. J. Roaco, Ltd. v Syntex Pharmaceuticals International, Ltd.*, 227 U.S.P.Q. 1033 (D.N.J. 1985).  It has been widely held that the irreparable injury prong is satisfied when there is potential loss of goodwill.  *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994).  *See also Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784 (8th Cir. 2010); *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009); and *Dominion Video Satellite, Inc. v. EchoStar Satellite, Inc.*, 269 F.3d 1149 (10th Cir. 2001).

"A [party's] harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke*

*Corp.*, 511 F.3d 535, 550 (6th Cir. 2007), *quoting Overstreet v. Lexington-Fayette Urban Cnty.*

*Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  The Sixth Circuit has held that competitive injuries and

loss of goodwill are difficult to quantify and can result in irreparable harm in the absence of an

injunction.   *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992); and *Certified*

*Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).

Moreover, if the potential economic loss is so great as to threaten the existence of a business, then

a preliminary injunction may be granted, even though the harm is ascertainable.   *American*

*Cyanamid Co. v. U.S. Surgical Corp*., 833 F. Supp. 92 (D. Conn. 1992); *Semmes Motors, Inc. v.*

*Ford Motor Co.*, 429 F.2d 1197, 1205 (2nd Cir. 1970); *Ahmed v. U.S.*, 47 F. Supp. 2d 389

(W.D.N.Y. 1999); and *Barron v. Vision Serv. Plan*, 575 F. Supp. 2d 825, 835 (N.D. Ohio 2008).

Given the strength of the Defendant's likelihood of success on the merits, the requisite

amount of harm to Chrisman Mill Farms that must be shown is greatly diminished because "the

likelihood of success on the merits is inversely proportional to the amount of irreparable harm that

will be suffered if an injunction does not issue." *Baker v. Adams County/Ohio Valley School Bd*.,

310 F.3d, 927, 928 (6th Cir. 2002). "A particularly strong showing of likely success on the merits

may allow for an injunction despite a weaker showing of irreparable harm, and vice versa." *Cabot*

*Corp. v. King*, 790 F. Supp. 153, 155 (N.D. Ohio 1992).

The Defendant's reasonable expectation of the loss of goodwill and the potential for the

financial ruin of the company clearly demonstrates irreparable harm and support the granting of a

temporary restraining order and preliminary injunction.

### D.      The Balance Of Hardships Demonstrates That Harm Is Unlikely To Befall The Plaintiff Or Others

The Court "must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988).

The Federal Circuit has held that a preliminary injunction against a patentee is appropriate where the balance of hardships tips sharply in the favor of the movant and a "serious question" exists. *Atari*, 897 F.2d at 1577.   A "serious question" is present where the movant has "a fair chance of success on the merits." *Id.*   "The 'balance of hardships' test…requires a showing of 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 103 (6th Cir. 1982), citing *Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973).   However, the Federal Circuit has explicitly held that the balance of hardships need not be shown to favor the movant as a prerequisite to awarding preliminary injunctive relief.  *Hybritech*, 849 F.2d at 1457 (holding that the grant of a preliminary injunction was within the discretion of the court when the balance of hardships favored neither party).

When the strength of CMF's likelihood of success on the merits is considered, the chance of any cognizable harm to the Plaintiff is remote at best.  Should the Plaintiff somehow succeed on the merits despite the clear lack of a necessary claim element in the allegedly infringing device, he can be compensated by royalties or a disgorgement of profits.  When balancing the relative hardships between the Plaintiff and Defendant in light of the strength of the arguments for non-infringement, it is clear that preliminary relief is warranted.

**E.     The Issuance Of A Temporary Restraining Order And Preliminary Injunction Is In The Public Interest**

The final criteria to consider in the decision to grant or deny preliminary relief is "…the impact of an injunction upon the public interest." *Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006). The causes of action in this suit present both private interests and public interests. In suits involving private interests, the public interest is typically not as important as the other criteria considered in the determination as to an award of a preliminary injunction. 8 J. Moore et al., *Moore's Federal Practice* § 65.22[3], p. 58 (3d ed. 2009).

When there are competing public interests, the court must balance those public interests. *Hybritech*, 849 F.2d at 1458. In this matter, the Court must balance protecting the rights secured by patents with other public interests such as fair competition and a discouragement of patent misuse. "[T]he public interest analysis in preliminary injunction cases is focused on the impact on non-parties rather than parties." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 907 (9th Cir. 2003), *citing Bernhardt v. Los Angeles County*, 339 F.3d 920, 931 (9th Cir. 2003). The relative burdens should be examined separately as part of the balance of hardships factor. *Id.*

The public has an interest in a patentee **fairly** asserting his patent to protect the rights he was awarded with the grant of a patent. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996) (emphasis added). However, Blazer is not fairly asserting his patent, he is expanding its scope beyond the grant of the patent. There is no public interest in a patentee unfairly asserting his patent, especially when the claim of infringement is objectively baseless and the patentee lacks a good faith belief in the allegations.

The public clearly has an interest in restraining a patentee's efforts to unfairly assert a patent by claiming patent rights that extend beyond the scope of the patent grant. In *Mallinckrodt,*

*Inc. v. Medipart, Inc.*, the Federal Circuit found that patent misuse harmed the public interest and explained that:

> [t]he concept of patent misuse arose to restrain practices that did not in themselves violate any law, but that draw anticompetitive strength from the patent right, and thus were deemed to be contrary to public policy. The policy purpose was to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right.

*Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703-04 (Fed. Cir. 1992).

There is also a public interest in free competition. *Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 684 (Fed. Cir. 1990). The public interest in the right to contract freely has also been found to support an injunction when tortious interference is alleged. *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1008 (S.D. Ohio 2008), *citing Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 572 (1972).

Given that Chrisman Mill Farms likelihood of success is substantially greater than the Plaintiff's, and that the allegations of infringement are not only unreasonable, but made in bad faith, there is no material risk to the public interest in the enforceability of the patent laws but there is considerable risk to the public's interest in free competition and preventing patent misuse. Moreover, inhibiting fair competition shrinks supply and increases prices, thus unfairly affecting consumers.

The public interest is also served by a temporary restraining order and preliminary injunction in this matter because patent misuse can indicate an antitrust violation, and "[e]njoining a likely antitrust violation would protect consumers." *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 270 (6th Cir. 2015), *citing United States v. Westinghouse Elec. Corp.*, 648 F.2d 642 (9th Cir. 1981). "[W]here a patentee seeks to expand the limited monopoly granted by the patent laws by misuse. . . it is subject to the antitrust laws." *Id*. In *Collins*, the court balanced the movant's

likelihood of success with the public's interest in preventing anticompetitive behavior and found the injunction to be warranted. *Id.* at 280.

The public interest in the enforceability of patents must be balanced against the public interest in free and fair competition and the harm to the public interest that results from patent misuse. Since there is no infringement of the patents-in-suit, and they are also likely invalid, there can be no harm to the public interest in enjoining Blazer's anticompetitive activities. However, the public interest in free competition clearly favors the grant of preliminary relief and since patent misuse supports a finding of tortious interference and an antitrust violation, the public interest would be harmed by not enjoining Blazer's activities.

## IV.    CONCLUSION

Chrisman Mill Farms has demonstrated that it is entitled to a temporary restraining order and a preliminary injunction. The Defendant has a strong likelihood of success in proving that it does not infringe the '624 Patent or RE46421 because the allegedly infringing product is missing required claim elements, the patents-in-suit are invalid in light of the prior art pursuant to 35 U.S.C. §103, lack enablement or do not meet the written description requirement of 35 U.S.C. §112(a), are indefinite under 35 U.S.C. §112(b), and likely invalid under 35 U.S.C. §102.

Chrisman Mill Farms has shown that it will suffer irreparable harm from the loss of goodwill and the likely closure of its business due to the loss of revenue should the relief sought not be granted. Moreover, the balance of hardships clearly shows that when the strength of CMF's likelihood of success on the merits is considered, the chance of any harm to the Plaintiff and others is non-existent. Lastly, the public interest is best served by the injunction given that patent misuse

is contrary to the public interest and the injunction will promote the public's interest in free competition.

Based on the foregoing, the Court should grant Chrisman Mill Farms' motion for a temporary restraining order and preliminary injunction ordering the Plaintiff to withdraw its notices of infringement and to refrain from further baseless enforcement activities.

Respectfully submitted,

/s/ James M. Francis

James M. Francis
Francis Law Firm
2333 Alexandria Dr.
Lexington, KY 40504
Phone: (859) 519-0755
Fax:    (859) 201-1315
jim@francis-law.com
*Counsel for Chrisman Mill Farms, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify on November 21, 2017, I electronically filed this document with the Clerk of

Court using CM/ECF, which will send electronic notification of such filing to the following

counsel of record.

Joseph J. Gleason
Gleason Law, LLC
780 Morosgo Drive
# 14084
Atlanta, GA 30324
*Counsel for Plaintiff*

_____
/s/ James M. Francis
James M. Francis
*Counsel for Chrisman Mill Farms, LLC*