UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| BRIAN ROBERT BLAZER, d/b/a | ) | |
| CARPENTER BEE SOLUTIONS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:17-CV-430-REW |
| | ) | |
| v. | ) | OPINION & ORDER |
| | ) | |
| CHRISMAN MILL FARMS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Plaintiff Brian Blazer, a carpenter bee trap inventor and patentee, accuses Defendant

Chrisman Mill Farms ("CMF") of selling (or at least attempting to sell) infringing traps. CMF,

among other counterclaims, seeks a judgment declaring its traps non-infringing or Blazer's patents

invalid. The matter is currently before the Court for claim construction.

## I.    BACKGROUND

Chief Judge Reeves, then assigned to this case, has ably summarized the factual backdrop:

Blazer owns U.S. Patent No. 8,375,624 ("the '624 Patent["]) which covers an insect
trap meant for carpenter bees. In December 2015, CMF began selling traps that
unknown to it allegedly infringed Blazer's patent. In light of the allegations of
infringement, CMF obtained a license under the '624 Patent and began selling traps
under the license on December[ ] 29, 2015. The duration of the agreement was one
year, ending in December 2016. Blazer sought to negotiate more favorable terms
for a new contract but was unsuccessful. As a result, the business relationship ended
and CMF designed a new trap which it believed did not infringe the '624 Patent.
CMF notified Blazer of its intent to begin marketing the new trap[ ] and provided
Blazer the opportunity to object and provide reasons why he believed the new trap
infringed on his patent. From the record before the Court, it appears that Blazer
never articulated to CMF why the trap infringed his patent and instead filed this
suit.

Blazer contacted several online retailers in February 2017, alleging CMF's new
trap infringed the '624 Patent. He contacted Amazon and asserted that CMF's new

1

trap infringes the claims of the '624 Patent, which caused Amazon to contact CMF and notify it of the allegations. Amazon indicated to CMF that attempts to relist the new trap prior to resolving the allegations of patent infringement may result in the removal of CMF's selling privileges on Amazon. In Blazer's original infringement contentions to Amazon, he wrongly indicated that the roof of the new trap extended past the top of the trap to the shelter the entrance. He later amended his infringement contentions to correctly note that the roof does not extend past the top and modified his contentions further.

Blazer also contacted Etsy.com, Bonanzo.com, and Houzz.com, alleging that the new trap infringes his patent. Subsequently, all of the retailors notified CMF of the allegations and indicated any further attempt to relist the new trap prior to resolving the allegations of patent infringement would result in the loss of selling privileges. The '624 Patent was reissued as RE46,421 [ ] on June 6, 2017. The reissue patent retains claims 1-12 without amendment, and adds reissue claims 13-21. Blazer has alleged that CMF's trap infringes claims 1-4, 7-8, 10, 13-17, and 20-21 of the patent.

DE 67 (Mem. Op. & Order) at 1–3 (internal citations omitted); *see also* DE 3-1 ('624 Patent); DE 52-2 (RE46,421). For present purposes, the Court sees no need to detail the circuitous procedural path this matter has taken (of which the parties and Court are well-familiar). The current operative pleadings are Blazer's Amended Complaint (DE 3), CMF's Amended Counterclaims (DE 18), and Blazer's Counterclaim Answer (DE 23). Plaintiff pleads infringement of the '624 Patent (Count I) and breach of contract (Count II). DE 3 at ¶¶ 37–55. Of the eight surviving[1] counterclaims, three of CMF's declaratory judgment requests pertain to the current claim construction inquiry. CMF seeks declarations that its "Wood Bee Gone" (Count 1) and "Wood Bee Gone II" (Count 2) carpenter bee traps do not infringe either of Blazer's patents and that both the '624 and RE46,421 patents are invalid or unenforceable (Count 3). DE 18 at ¶¶ 76–105.

Pursuant to Judge Reeves's claim construction briefing schedule (DE 43 at 2), the parties submitted a Joint Claim Construction Statement (DE 65) and exhaustively briefed the disputed

---

[1] Judge Reeves dismissed CMF's ninth counterclaim—which sought an inequitable-conduct-based declaration of invalidity concerning RE46,421 (DE 18 at ¶¶ 161–164)—with prejudice. DE 67 at 7–8, 14.

constructions. DE 68 (Blazer's Opening Brief); DE 73-1 (Response); DE 77 (Reply); DE 90

(Surreply). The matter, now before the undersigned, stands ripe for review.

## II.   APPLICABLE LAW

*Claim Construction*

Under the Patent Act, inventors seeking protection for their creations must provide a

specification containing:

> [A] written description of the invention, and of the manner and process of making
> and using it, in such full, clear, concise, and exact terms as to enable any person
> skilled in the art to which it pertains, or with which it is most nearly connected, to
> make and use the same, and shall set forth the best mode contemplated by the
> inventor or joint inventor of carrying out the invention.

35 U.S.C. § 112, ¶ 1. Further, the specification must "conclude with one or more claims particularly

pointing out and distinctly claiming the subject matter which the [inventor] . . . regards as his

invention." 35 U.S.C. § 112, ¶ 2. "It is a 'bedrock principle' of patent law that 'the claims of a

patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH

Corp.*, 415 F.3d 1303, 1312 (2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration

Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). For patent cases, as former Chief Judge Rich

put it: "The name of the game is the claim."[2]

Accordingly, the Court must construe contested "material claim terms" to the extent

necessary to resolve the parties' dispute, to provide an intelligible foundation for jury instructions

"should the case go to trial[,]" and to establish a basis for "meaningful appellate review." *AFG

Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001). "Claim construction is a

matter of resolution of disputed meanings and technical scope, to clarify and when necessary to

---

[2] Giles S. Rich, *The Extent of the Protection and Interpretation of Claims—American Perspectives*,
21 Int'l Rev. Indus. Prop. & Copyright L., 497, 499 (1990).

explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). "The proper construction of a patent's claims is an issue" this Court resolves under "Federal Circuit law[.]" *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011).[3]

Unsurprisingly, claim construction begins "with the words of the claim." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005). The Court must typically assign claim terms the "ordinary and customary meaning" they would have to "a person of ordinary skill in the art in question" (a POSITA). *Phillips*, 415 F.3d at 1313; *see id.* (The relevant temporal lens is the "time of the invention, *i.e.*, . . . the effective filing date of the patent application.").[4] Two exceptions pertain: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee [clearly and unmistakably] disavows the full scope of a claim term either in the specification or during prosecution." *Unwired Planet, LLC v. Apple, Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) (citation and quotation marks omitted).

In pursuit of the proper construction, context is key. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (Claims "must be read in view of the specification, of which they are a part."), *aff'd*, 116 S. Ct. 1384 (1996). "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Thus, "the specification is

---

[3] The Supreme Court's ubiquitous *Markman v. Westview Instruments, Inc.* decision established the proper division of labor for the "two elements of a simple patent case, construing the patent and determining whether infringement occurred[.]" 116 S. Ct. 1384, 1393 (1996). "The first is a question of law, to be determined by the court"; "[t]he second is a question of fact, to be submitted to a jury." *Id.* (citation and quotation marks omitted).

[4] *Id.* (noting the "well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art.").

always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

Also in the category of so-called "intrinsic evidence[,]" the Court may "consider the prosecution history of the patent[.]" *Id.* at 1582–83. This "complete record of all the proceedings before the Patent and Trademark Office" (PTO), "is often of critical significance" as it may include "express representations made by the applicant regarding the scope of the claims." *Id.* at 1582. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.[5] Last, the "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

"If upon examination of this intrinsic evidence the meaning of the claim language is sufficiently clear, resort to 'extrinsic' evidence, such as treatises and technical references, as well as expert testimony when appropriate, should not be necessary." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). Indeed, "[r]elying on extrinsic evidence to construe a claim is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001) (citation and quotation marks omitted) (collecting cases).[6]

---

[5] The record includes the prosecution history of the relevant patents at DE 18-2, 18-3 & 18-4. Only CMF (and then, only once) seeks to leverage that history in support of its claim construction argument. *See* DE 73-1 at 23 (citing DE 18-2 at 42).

[6] *But see id.* ("Extrinsic evidence may always be consulted, however, to assist in understanding the underlying technology." Though it "may never be used for the purpose of varying or contradicting the terms in the claims." (citation and quotation marks omitted)).

Ultimately, "[c]laim construction must begin and remain centered on the claim language." *Skedco, Inc. v. Strategic Operations, Inc.*, 685 F. App'x 956, 959 (Fed. Cir. 2017). With that focus in mind, the preceding framework guides the Court's interpretive inquiry.

### Infringement

To further set the stage for the claim construction analysis, a brief discussion of infringement (a pillar of the underlying dispute) pertains. Per the Federal Circuit:

> Infringement is defined in 35 U.S.C. § 271(a) as the unlicensed making, using, or selling of a patentee's claimed invention. Recognizing frailties of language and limitations on human foresight, the law acknowledges that one may appropriate another's patented contribution not only with a product precisely described in a patent claim (literal infringement) but also with a product that is not quite so described but is in *fact* "substantially the same thing, used in *substantially* the *same* way, to achieve substantially the same result" (doctrine of equivalents).

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985). Thus, the essential inquiry: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 117 S. Ct. 1040, 1054 (1997).

For purposes of infringement, "the claims of the patent, not its specifications, measure the invention." *Smith v. Snow*, 55 S. Ct. 279, 283 (1935). Thus, claim construction marks a critical "first step" in any infringement analysis. *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019) (citation omitted). "The second step is comparing the properly construed claims to the device accused of infringing." *Id.* The burden of persuasion for infringement (as well as non-infringement counterclaims) is the patentee's. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014).

Notably, infringement requires proof of duplication or equivalence as to each element of an **independent** claim. "One may infringe an independent claim and not infringe a claim

dependent on that claim. The reverse is not true." *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989). [A claim "presented in dependent form" refers back to and further limits "another claim or claims in the same application." 37 C.F.R. § 1.75(c). Such dependent claims are "construed to include all the limitations of the claim incorporated by reference into the dependent claim." *Id.*]

With these principles in mind, the Court turns to the patents-in-suit.

## III.   DISCUSSION

### a.   The Independent Claims

As Blazer acknowledges, "Claims 1-12 of the '624 Patent are identical to Claims 1-12 of RE46,421." DE 23 at ¶ 78.[7]   Thus, the Court will refer to RE 46,421, which fully incorporates, expands on, and supersedes the '624 Patent, as the "Patent" for claim construction purposes. The Patent recites two independent claims. The first claims:

1. A carpenter bee trap comprising:

a trap entrance unit forming a plenum being made of wood or a wood substitute;

said trap entrance unit having at least one hole drilled there-through and sized to mimic a natural carpenter bee nest tunnel so as to provide a primary attractant;

---

[7] The USPTO, by granting the reissue, legally acknowledged that the claims added in RE 46,421 could (and should) have properly been included in the '624 Patent. *See* 35 U.S.C. § 251(a) (authorizing reissue when a "patentee claim[s] . . . less than he had a right to claim in the patent" but forbidding introduction of "new matter . . . into the application for reissue"); 37 C.F.R. § 1.176(a) ("A reissue application will be examined in the same manner as a non-reissue . . . and will be subject to all the requirements of the rules related to non-reissue applications."); *Grant v. Raymond*, 31 U.S. 218, 244 (1832) (finding that a reissued patent is not "independent of the" original, that "communication of the discovery to the public has been made" in the original patent "with the intent to exercise a privilege which is the consideration paid by the public for the future use of the machine[,]" and that "[i]f, by an innocent mistake, the instrument introduced to secure this privilege fails in its object, the public ought not to avail itself of this mistake, and to appropriate the discovery without paying the stipulated consideration"). On reissuance, the original patent is effectively surrendered but "every reissued patent shall have the same effect and operation in law . . . as if the same had been originally granted in such amended form[.]" 35 U.S.C. § 252.

said hole extending from the outside of the trap unit to a plenum interior; said hole being configured to extend substantially horizontally or at an upward angle; a means to shelter an entrance to said hole is provided to reduce the admittance of ambient light;

said trap unit further comprising a receptacle adapter being substantially located at the bottom of said trap unit and being configured to receive a clear or translucent receptacle;

a receptacle received by said adapter situated to allow ambient light to enter through said bottom into said plenum interior, thereby providing a secondary attractant; said receptacle further being provided to receive trapped bees.

DE 52-2 at col. 7, ll. 40–60 (Claim 1). The second claims:

13. A carpenter bee trap, comprising:

a trap entrance unit formed of wood or a wood substitute, wherein at least one side of the trap entrance unit has at least one entrance hole that extends from outside the trap entrance unit to an interior of the trap entrance unit, wherein the at least one entrance hole extends substantially horizontally or at an upward angle with a size and shape configured to provide a primary attractant for carpenter bees, and wherein the trap entrance unit further comprises an exit opening for providing an exit path from the interior of the trap entrance unit; and

a receptacle adapter located at the exit opening of the trap entrance unit, wherein the receptacle adapter is adapted to receive at least one receptacle and is adapted so as to allow at least some ambient light to enter the interior of the trap entrance unit via the exit opening, thereby providing a secondary attractant for carpenter bees.

*Id.* at col. 8, ll. 24–41 (Claim 13). The Patent further recites eleven claims dependent on independent Claim 1, and eight claims linked to independent Claim 13. *See id.* at col. 7, ll. 61–67 & col. 8, ll. 1–23 (Claims 2–12); *id.* at col. 8, ll. 42–67 & col. 9, ll. 1–2 (Claims 14–21). Plaintiff alleged or alleges infringement of both independent and most dependent claims, excepting only Claims 5–6, 9, 11–12, 18–19. *See* DE 56 at 3 (asserting Claims "1-4, 7-8, 10, 13-17 and 20-21"). The claim terms are the foundational target of the present interpretive inquiry.

### b.  The POSITA

To complete the claim construction footing, the Court must determine the appropriate lens through which to read the claims. Because the "objective baseline" is "how a person of ordinary skill in the art understands a claim term[,]" this inquiry boils down to a single question: Who is the applicable POSITA? *See Phillips*, 415 F.3d at 1313. The patent-in-suit "relates to the general field of flying insect traps and the specific field of carpenter bee traps." DE 52-2 at col. 1, ll. 12–13; *see Phillips*, 415 F.3d at 1313 (The POSITA provides the "starting point" because "inventors are typically persons skilled in the field of the invention and . . . patents are addressed to and intended to be read by others of skill in the pertinent art."). Thus, the Court finds that the relevant interpretive fountainhead is a person with working skill and knowledge of flying insect traps. *Cf. Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1361, 1365 (Fed. Cir. 2015) (defining, for a patent "directed toward manufacturing processes for an electro-optical device such as liquid crystal display (LCD)[,]" the POSITA as "someone with knowledge of LCD manufacturing"). With the groundwork laid, the Court turns to the specific claim terms.

### c.  Terms Requiring No Construction

Initially, the Court addresses several claims that—though listed in the initial claim construction statement (DE 65)—do not require Court construction. "Article III tribunals have no jurisdiction to render [advisory] opinions." *Superior Indus., Inc. v. Masaba, Inc.*, 553 F. App'x 986, 989 (Fed. Cir. 2014). Thus, this Court lacks jurisdiction to construe claims if such "construction does not affect the issue of infringement." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1322 (Fed. Cir. 2015). Again, the parties' dispute encompasses, at most, claims 1–4, 7–8, 10, 13–17, and 20–21 of RE46,421. DE 56 at 3. Claim 5, addressing a "receptacle [ ] configured to provide

a friction fit with said bottom of said plenum," is not in issue. DE 52-2 at 17; *see also* DE 65 at 7. Thus, the Court declines an advisory construction of this element.

      The parties agree that the phrase "receptacle is configured to be screwed into said bottom of said plenum" (from Claim 4) needs no construction and that its "[p]lain and ordinary meaning should prevail." DE 73-1 at 26; *see* DE 68 at 17–18. Similarly, CMF does not challenge Blazer's contention that "with a size and shape configured to provide a primary attractant for carpenter bees" (from Claim 13) "require[s] no construction." DE 68 at 13.[8] "Claim construction is a matter of resolution of **disputed meanings** and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical*, 103 F.3d at 1568 (emphasis added). The Court's construction duty hinges on the parties presenting a "fundamental dispute regarding the scope of a claim term[.]" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see id.* ("[D]istrict courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims.") (emphasis in original); *see also Polara Eng'g Inc v. Campbell Co.*, 894 F.3d 1339, 1352 (Fed. Cir. 2018) ("The court resolved the only dispute presented to it by adopting [defendant's] proposal to instruct the jury on plain and ordinary meaning."). The Court, for now, sees no need to construe these undisputed terms.

### d.  Agreed Definitions

      The parties fully concur on definitions for four terms within the claims. *See* DE 65 at 3. Per the Joint Claim Construction Statement:

    1)  "receptacle adapter" is "[a] connector for joining a receptacle to the trap";

---

[8] Plaintiff, replying, pointed out this evident waiver. *See* DE 77 at 3. Defendant's surreply did not dispute the point. *See generally* DE 90.

2)   "ambient light" is "[t]he light surrounding a trap";

3) & 4) "entrance hole" and "entrance opening" both mean "[a] hole through which carpenter bees enter the trap."

*Id.* Notwithstanding the parties' concurrence, the Court retains "an independent obligation to determine the meaning of the claims[.]" *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995). The Court has fully reviewed the intrinsic evidence and finds the first three agreed definitions reasonable and appropriate. However, the parties' identical construction of the distinct terms, "entrance hole" and "entrance opening," gives the Court pause. *See Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (applying a "general presumption that different [claim] terms have different meanings").

The presumption that distinct usage connotes different meaning applies "[i]n the absence of evidence to the contrary[.]" *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000). The specification—*i.e.* the "single best guide[,]" *Vitronics*, 90 F.3d at 1582—does not use "entrance opening" and "entrance hole" interchangeably. Indeed, the '624 Patent wholly omits the phrase "entrance opening," *see* DE 3-1; it appears for the first time in the final sentence (Claim 21) of RE46,421. *See* DE 52-2 at col. 9, ll. 1–2. Dependent Claim 21 describes an "entrance opening" by spatial reference to an "exit opening[.]" *Id.* The underlying independent claim (13), provides for an "entrance hole that extends from outside the trap entrance unit to an interior of the trap entrance unit . . . substantially horizontally or at an upward angle with a size and shape configured to provide a primary attractant for carpenter bees[.]" *Id.* at col. 8, ll. 27–32. The specification teaches that carpenter bee nests "consist of tunnels ½ inch in diameter and 6 to 10 inches deep" and notes that the "entrance" to such tunnels commonly "slope[s] upward" and features a "near vertical opening[.]" *Id.* at col. 1, ll. 26–30.

11

From the intrinsic evidence, the Court arrives at several conclusions. First, the claimed "entrance hole" has a measurable if indeterminate length and extends from the exterior of the "trap entrance unit" to the interior. Second, the "entrance hole" has both an entrance opening outside the unit and a passage to the unit interior. Third, the "entrance opening" refers to a distinct portion of the "entrance hole"; namely, the opening at the trap entrance unit face. Thus, to square the distinct term with the agreed and reasonable "entrance hole" definition, the Court construes "entrance opening" as the opening of the hole, at the trap entrance unit face, through which carpenter bees enter the trap.

### a. Disputed Constructions

Before analyzing the disputed terms, a few preliminary items. First, portions of CMF's briefing rely on the views of purported POSITA Timothy R. Pennington. *See* DE 73-1 at 10, 12, 15, 25 (discussing Pennington opinions); *see also id.* at 33 (Pennington Decl.). Judge Reeves excluded that proof, and Judge Boom (also previously assigned to this matter) denied CMF's motion for reconsideration. DE 89 (Mem. Op. & Order excluding); DE 97 (Order denying reconsideration). Accordingly, the Court omits substantive consideration of Pennington-linked discussion. Second, Blazer spends much of its reply criticizing CMF's response for arguing constructions distinct from the joint-statement proposals. *See, e.g.*, DE 77 at 2, 9, 11–17. Per Blazer, this conduct violated Judge Reeves's scheduling order. *Id.* at 2. CMF's change in tack may have violated the spirit of that order, but Judge Reeves did not expressly mandate a responsive brief that hewed to the joint-statement proposals. More importantly, Blazer fails to identify any authority suggesting that the Court may abdicate its construction duty and ignore a clearly presented dispute on term scope "when a party does not comply with a scheduling order." *Steyr Arms, Inc. v. Beretta USA Corp.*, No. 2:15-CV-1718-MHH, 2018 WL 1876345, at *5 (N.D. Ala.

Apr. 19, 2018) (citing *O2 Micro*, 521 F.3d at 1362). Thus, the Court assesses the proposals presented. Third, the Court notes that prior claim constructions (or, indeed, this Opinion) do not unalterably fix the construction of claims for the full life of the matter. As the Federal Circuit has recognized, "district courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005).[9] Thus, the Court may, upon any appropriate basis, modify any prior constructions.

*Means-Plus-Function Claiming*

The parties dispute whether several Patent elements are so-called "means-plus-function" claims under 35 U.S.C. § 112, ¶ 6.[10] This provision allows:

> patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc). For claim construction purposes, the Court first determines whether § 112, ¶ 6 applies to a given limitation. Several considerations pertain. First, the presence or absence of the word "means" creates a rebuttable presumption. If a claim element references "means," § 112, ¶ 6 presumptively applies; the converse is also true. *Williamson*, 792 F.3d at 1348. Concerning rebuttal, absent the word "means," § 112, ¶ 6 "will apply if the challenger demonstrates that the claim term fails to recite

---

[9] *See also Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1381–82 (Fed. Cir. 2003) (finding no error in district court's amendment of claim construction during oral arguments for pretrial motions nearly two years after the original construction).

[10] Paragraph 6 provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id.*

sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (quotation marks and alterations omitted). Ultimately, "[t]he standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1349. Put differently, "[w]hat is important is not simply that [the relevant element] is defined in terms of what it does, but that the term [used], as the name for structure, has a reasonably well understood meaning in the art." *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996).

—   **"sized to mimic a natural carpenter bee nest tunnel"**

CMF argues the following (bolded portion) from Claim 1 should be construed under the § 112, ¶ 6 mechanics: "at least one hole drilled there-through and **sized to mimic a natural carpenter bee nest tunnel** so as to provide a primary attractant[.]" DE 52-2 at col. 7, ll. 44–46. *See* DE 73-1 at 18–24. The relevant phrase does not use the word "means." Thus, the contrary presumption applies. For the following reasons, CMF's rebuttal effort wholly fails.

The relevant structure is the "at least one hole[.]" CMF does not explain why a POSITA might find this term insolubly indefinite. Defendant, though reciting the relevant standards at length, offers less than a paragraph of case-specific argument on this topic. DE 73-1 at 22–23. Essentially, CMF notes that the specification and prosecution history provide somewhat limited examples concerning the parameters of a typical nest tunnel. *See, e.g.*, DE 52-2 at col. 1, ll. 26–27 ("½ inch in diameter and 6 to 10 inches deep"). One problem: Defendant skipped the critical analysis. CMF does not argue that a "hole," as structure, lacks a "reasonably well understood meaning" to a POSITA. *Greenberg*, 91 F.3d at 1583. The Court fails to see how additional clarity concerning the size of the envisioned hole might flummox an insect-trapping artisan. Put

14

differently, a limitation on a well-known structural term does not render that term indefinite.[11] The presumption stands.

Alternatively, CMF argues that the Court should construe the "sized to mimic" language as limiting the "hole" to a diameter between ½ and ¾ inches. DE 73-1 at 24. Defendant's proposal is far too limiting.

First, CMF's interpretation violates the doctrine of claim differentiation by rendering dependent Claim 7 superfluous. Though not a "hard and fast rule[,]" this doctrine erects "a presumption that each claim in a patent has a different scope." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). Claim 7 explicitly limits the Claim 1 trap to one with a hole diameter "between ½ inch to ¾ inch." DE 52-2 at col. 8, ll. 7–8. Thus, CMF's reading of the "sized to mimic" limit would make Claim 7 hollow. Defendant fails to justify such a "disfavored" construction. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1173 (Fed. Cir. 2005).[12]

---

[11] *See TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 786 (Fed. Cir. 2019) (finding that dependent claims which added "limitations that either describe particular structural features or flesh out whether the term has a particular structural meaning" indicate that "§ 112, ¶ 6 does not govern"); *Phillips*, 415 F.3d at 1311 (finding § 112, ¶ 6 treatment of "steel baffles" in the phrase "means disposed inside the shell for increasing its load bearing capacity comprising internal steel baffles extending inwardly from the steel shell walls" inappropriate as the claim recited sufficiently definite structure).

[12] CMF argues that the prosecution history "defines the hole of claim 1 as having a diameter between ½ inch and ¾ inch." DE 73-1 at 23. Defendant's reading of the cited history is incomplete. The relevant statement is characterizing the hole described "in claims 1 **and** [then] 13[.]" DE 18-2 at 42 (emphasis added). What was claim 13 at that stage of the prosecution became Claim 7 in the patents-in-suit. *See* DE 18-2 at 39. Essentially, the cited verbiage amounts to little more than a statement that the Claim 1 trap as limited by current Claim 7 would have at least one entrance hole between ½ and ¾ inches in diameter. That remains true, and undisputed. The Court finds no novel interpretive value in the subject statement. *See Grober v. Mako Prod., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) ("[T]he doctrine of prosecution disclaimer only applies to unambiguous disavowals."); *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1401 (Fed. Cir. 2008) (concluding that "the cited prosecution history . . . lacks the clarity of the specification regarding the meaning of the claim terms at issue here, thus rendering it less useful for claim construction purposes").

Second, "when a claim term is expressed in general descriptive words," courts do not "ordinarily limit the term to a numerical range that may appear in the written description or in other claims." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). However, this rule bears exceptions. *Amazin' Raisins Int'l, Inc. v. Ocean Spray Cranberries, Inc.*, 306 F. App'x 553, 557 (Fed. Cir. 2008). And, in any event, the Court finds it only partly applicable here. The "mimic" modifier is key. This is a general descriptive word that forecloses, in the Court's view, the type of exacting numerical construction that CMF posits. That said, the Court finds "natural carpenter bee tunnel" non-general and necessary to construe.[13]

The Patent pegs *typical* tunnel diameter at half an inch. DE 52-2 at col. 1, ll. 26. The specification-cited prior art estimates nest tunnel diameters ranging from ⁵⁄₁₆ to ¾ inches. *See* Electronic Carpenter Bee Trap, U.S. Patent No. 7,757,432 col. 1, ll. 22–23 (filed Jul. 9, 2006) (hereinafter "Gunderman Patent") ("The carpenter bees bore a hole of up to ¾ inch in diameter[.]"); Carpenter Bee Trap, U.S. Patent No. 6,766,611 col. 1, ll. 34–37 (filed March 27, 2001) (hereinafter "Prince Patent") (describing a "hole having about the same size as holes normally made by carpenter bees" as ranging "from about ⁵⁄₁₆ inch").[14] The Court finds that these

---

[13] The Court is cognizant of dueling construction canons: "(a) one may not read a limitation into a claim from the written description, but (b) one may look to the written description to define a term already in a claim limitation, for a claim must be read in view of the specification of which it is a part." *Renishaw*, 158 F.3d at 1248. Inherent ambiguity in the concept of a "natural carpenter bee nest tunnel" requires resort to the intrinsic evidence to divine that term's meaning. Further, given the "sized" antecedent, the Court finds that a sound construction necessitates reference to some specific figures. [The Court might, at the bottom-end of the range, construe the term as requiring a hole large enough to permit entry of a carpenter bee. But such an interpretation would likely import even greater ambiguity. Relevant questions might include: What age carpenter bee? How large, exactly, is a carpenter bee?]

[14] The specification cites each of these prior art references. *See* DE 52-2 at 2–3. "When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000).

intrinsic evidentiary teachings approximate what a POSITA would come up with for a "natural tunnel" baseline range, prior to evaluating the flexible "mimic" modifier.

Thus, the Court construes "hole . . . sized to mimic a natural carpenter bee nest tunnel" as a hole sized to mimic a natural carpenter bee tunnel, with a diameter of around $\frac{5}{16}$ to ¾ inches.[15]

> — **"hole . . . configured to extend substantially horizontally or at an upward angle"**

Next, CMF ineffectively seeks to inject complexity into a straightforward hole-configuration limitation. DE 73-1 at 24–25. Per Defendant, "substantially horizontally" and "at an upward angle" are mutually exclusive geometries. *Id.* at 25. The Court disagrees. A hole drilled with 5° upward slope—an option the specification expressly contemplates, *see* DE 52-2 at col. 6, ll. 38–40—is a configuration both substantially horizontal and at an upward angle. Both parties agree that the plain and ordinary meaning to a POSITA controls. Further, the solid-block embodiments (DE 52-2 at Figs. 3 & 5) feature a tunnel-type plenum formed by entrance holes that may extend both, depending on the interval, at an upward angle **and** substantially horizontally. The Court finds no basis for a definition that excludes anything other than holes extending (from the exterior) at a substantially downward angle.[16] *Liquid Dynamics Corp. v. Vaughan Co.*, 355

---

[15] Prior art observes that a "manmade hole" sized from "about $\frac{5}{16}$ to $\frac{7}{8}$ inch . . . would entice a carpenter bee[.]" Gunderman Patent at col. 2, ll. 65–68. A predecessor trap patentee—after noting the critical importance of the "shape of the entry hole" for "effectiveness"—specified an entry hole with a diameter "from about ¼ inch to about 1 inch." *Id.* at col. 3, ll. 31–32. However, RE46,421 does not provide for explicit boundaries concerning the potential size range for valid mimicry. Thus, the Court finds it appropriate to retain the flexibility inherent in the "mimic" term. Further, the use of "around" in this construction respects the patentee's choice not to explicitly limit the tunnel diameter. *See Skedco*, 685 F. App'x at 959 ("Absent a clear disavowal or lexicography by a patentee, however, he or she is free to draft a claim broadly and expect the full claim scope."); *Abbott Labs. v. Baxter Pharm. Prod., Inc.*, 471 F.3d 1363, 1368 (Fed. Cir. 2006) (declining to construe a "phrase with numerical exactitude" when such precision was unnecessary to resolve the parties' dispute).

[16] In *Acumed LLC v. Stryker Corp.*—after the district court defined the term "curved shank" as a "shank that has a bend or deviation from a straight line without sharp corners or sharp angles[,]"

F.3d 1361, 1368 (Fed. Cir. 2004) ("The term 'substantial' is a meaningful modifier implying 'approximate,' rather than 'perfect.'"); *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003) ("[W]ords of approximation, such as 'generally' and 'substantially,' are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." (some quotation marks omitted)).

Defendant, based in part on the failed mutual exclusivity theory, also argues that because the specification discloses only holes drilled at a constant angle, the claim must be construed to include that restriction. DE 73-1 at 25. The Court sees no support in the claim for the proposed "linear" hole limit and thus declines to read in the unclaimed constraint. *See Acumed*, 483 F.3d at 805 (rejecting "an attempt to import a feature from a preferred embodiment into the claims."). [For one example, a "substantially horizontal" hole might be, in part, wholly horizontal and, in part, upward sloping.] Thus, the Court concludes that "configured to extend substantially horizontally or at an upward angle" means <u>configured to extend at an angle not materially downward</u>.[17]

— **"means to shelter an entrance to said hole is provided to reduce the admittance of ambient light"**

The parties broadly agree that this is a means-plus-function claim. Given the presumptive effect of "means" usage, and on this record, the Court agrees. The parties' proposed constructions otherwise diverge.

---

483 F.3d 800, 804 (Fed. Cir. 2007) (quotation marks omitted)—the Federal Circuit rejected the Defendant's argument that failure to define "how 'sharp' is too sharp" rendered the "construction insufficiently definite[.]" *Id.* at 806. "[A] sound claim construction need not always purge every shred of ambiguity." *Id.* Per *Acumed*, any imprecise zone of the lower court's ("correct") construction was irrelevant because the there was "no danger" of the accused infringing product "falling within that area." *Id.*

[17] *Cf. Playtex Prod., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) ("The district court mistakenly assumed that a surface having less curvature than another surface is necessarily curved, and cannot be flat.").

CMF insists that separately construing "entrance to said hole" is a necessary predicate for a sound construction of the § 112 claim. *See* DE 73-1 at 13–14. Defendant raises the fair point that "entrance hole" and "entrance to said hole" should not be construed synonymously (this was, of course, the Court's view on "entrance hole" and "entrance opening"). *See Chi. Bd. Options Exch.*, 677 F.3d at 1369 (applying a "general presumption that different [claim] terms have different meanings"). CMF argues that, the purpose of using "entrance" in the "claim phrase "entrance to said hole"" is to describe "that the hole has an entrance." DE 73-1 at 14. The Court agrees, as a matter of fact and logic, that part of the claimed "hole" is an "entrance." *See id.* However, the Court differs as to CMF's follow-on claim that the entrance "must be construed to be a **separate structure** from the" hole. *Id.* at 15 (emphasis added); *cf. Skedco*, 685 F. App'x at 959–60 ("In short, we agree with the district court that a 'pump' is not a 'valve,' but nothing in the claims or specification prohibits a valve from residing within a pump.").

Tellingly, Defendant's own argument belies the theory. CMF asserts that the hole "**has** an entrance." *Id.* at 14 (emphasis added). As that contention suggests, the described entrance is part of the hole.[18] Further, CMF's interpretation of the full claim phrase demonstrates the absurd result of its unduly convoluted reading of "entrance to said hole." CMF reads the phrase "means to shelter [an] entrance to said hole is provided to reduce the admittance of ambient light" as requiring "a structure that can prevent light **from entering the entrance hole through the entrance to the entrance hole.**" DE 73-1 at 16 (emphasis added). The Court sees no evidence counseling such a tortured construction. *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006)

---

[18] The Court further notes the inconsistency between CMF's agreement regarding the interchangeability of "entrance hole" and "entrance opening" and its theory regarding "entrance to said hole." The Court rejected the parties' agreement on that topic, but CMF's insistence regarding structural separateness of the "entrance" remains logically incompatible with failure to press for a like construction of "opening."

(rejecting a proposed construction that would have rendered the claim "nonsensical"). Defining a portion of a given structure as an entirely distinct structure is neither plain nor ordinary. *See Skedco*, 685 F. App'x at 959 (assigning error to construction of "'at least one valve in fluid communication with said pump' to require the pump and valve to be physically separate structures"). The claim text, supported by the full specification, shows that the "entrance" is a sub-part of the hole. Specifically, the portion of the hole extending from "the outside of the trap[.]" *See* DE 52-2 at col. 7, ll. 47–48 (describing a hole "extending **from** the outside of the trap unit to a plenum interior" (emphasis added)).

Further, two pieces of intrinsic evidence convince the Court that the "entrance to said hole" is a subsection of the "entrance hole" with measurable length. First, the specification describes the "entrance hole" as itself serving the relevant sheltering function. *See id.* at col. 5, ll. 29–30 ("[T]he sheltered entrance hole also prevents ambient light from directly entering the entrance hole[.]"). CMF's view of the "entrance" as limited to the infinitesimal boundary between the trap and its surroundings is thus inconsistent with the specification. Why? Under Defendant's construction of "entrance," the hole could not perform the sheltering function because the entrance hole "does not lie between the ambient light and" its own threshold. DE 73-1 at 16. Again, the specification envisions the angular roof of the entrance hole itself acting to shelter its "entrance." *See, e.g.* DE 52-2 at col. 6, ll. 38–41 (describing upward sloping bores "to provide sheltered entrance holes"); *id.* at ll. 52–54 (same). The fact that CMF's construction would read out specification-identified sheltering structures strongly indicates that the defense's interpretation is incorrect. *See Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever,

correct." (citation and quotation marks omitted));[19] *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276–

77 (Fed. Cir. 2008) ("At leas[t] where claims can reasonably [be] interpreted to include a specific

embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative

evidence on the contrary.").[20]

Second, the specification describes bees as still "entering" the entrance hole while inside

the hole and able to perceive overhead light within the trap plenum. *See id.* at col. 6, ll. 14

---

[19] CMF notes an exception to this general principle for "unambiguous" claim language. *See* DE 73-1 at 16 (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008)). However, this is hardly a circumstance where "claim language expressly requires" CMF's proposed limitation with no contraindication in the specification. *See Lucent*, 525 F.3d at 1216. Even if "entrance to said hole" could be described as unambiguous—a dubious premise in the context of confounding proximate claim elements like "entrance hole" and "entrance opening"— that phrase certainly does not manifestly compel the interpretation Defendant poses. Ultimately, this element is, in the Court's view, hardly perspicuous; thus, the general presumption favoring construction consistent with embodiments persists.

[20] CMF also tries to make hay with the Patent's casting of the trap entrance unit as "preferably hollow[.]" DE 52-2 at col. 3, ll. 39–41. Per Defendant, this means the solid-block configurations depicted in Figures 3a–5c are not "preferred" embodiments. *See* DE 73-1 at 19. This theory does not advance CMF's interpretive aims. First, Defendant cites no supportive precedent. Second, the argument ignores (A) the patentee's prefacing disclaimer, *see* DE 52-2 at col. 2, ll. 34–42, (B) the description of the figures as depicting 5 coequal "embodiment[s] of a carpenter bee trap according to the present invention[,]" *id.* at col. 4, ll. 15–40, and (C) that inclusion of a drawing (given the effort necessary) is, itself, some persuasive evidence that an embodiment is preferred. *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1310 (Fed. Cir. 2012) (Newman, J., concurring) ("The patent drawings illustrate the invention, and generally represent preferred embodiments of the invention.") (citing *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006)). Third, an inventor may describe multiple preferred embodiments. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005) ("Nevertheless, a patentee typically claims broadly enough to cover less preferred embodiments as well as more preferred embodiments, precisely to block competitors from marketing less than optimal versions of the claimed invention."). Fourth, even if a solid-block construction is somewhat "less preferred," the Federal Circuit has not strictly limited the presumption against reading out disclosed embodiments to configurations with a "preferred" label explicitly attached. *See, e.g., Oatey,* 514 F.3d at 1276– 77 ("We normally do not interpret claims in a way that excludes embodiments disclosed in the specification."); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (same). Last, Figure 1 (which CMF accepts as preferred) likewise, and consistent with the Court's reading, includes an upward angled "sheltered entrance hole[.]" DE 52-2 at col. 5, ll. 29– 30 & Figs. 1A, 1B; *see also id.* at col. 2, ll. 49–51 ("the roof of the trap entrance unit . . . provides **added** shelter" (emphasis supplied)).

(describing "bees entering entrance hole 31 are immediately attracted by the light" reflected upward into the trap plenum from the exit opening). That is, the written description treats the "entrance" as a portion of the entrance hole's passage where bees can be (physically); sort of an apian threshold or vestibule.[21] This too contradicts CMF's conception of a hairline, liminal "entrance." *Vitronics*, 90 F.3d at 1582 (The specification is usually "dispositive; it is the single best guide to the meaning of a disputed term.").

Based on the intrinsic record, the Court finds that the "entrance to said hole" is a segment of the "entrance hole." Accordingly, the Court construes "entrance to said hole" as <u>the portion of the entrance hole around the trap entrance unit face, through which carpenter bees enter the trap</u>.[22]

Next, the Court turns to construction of the full § 112, ¶ 6 claim: "means to shelter an entrance to said hole is provided to reduce the admittance of ambient light[.]" DE 52-2 at col. 7, ll. 50–51. Per the Federal Circuit:

> The first step in construing such a limitation is a determination of the function of the means-plus-function limitation. The next step is to determine the corresponding structure described in the specification and equivalents thereof.

*Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). In determining function, the Court must hew to the claim language. The construction must neither narrow function beyond the claim terms nor ignore clearly included limitations. *Lockheed Martin*

---

[21] *Cf.* DE 52-19 (Windsor Patent App.) at 9, col. 2 ("Entryways for the insects are created that **extend** from either a side surface or front surface of the wood-boring insect trap to the longitudinal passage." (emphasis added)); DE 52-2 at col. 2, ll. 14 (describing the Windsor Application as featuring "entry hole geometry that closely mimics natural carpenter bee nest holes").

[22] *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) ("[A] court need not attempt the impossible task of resolving all questions of meaning with absolute, univocal finality. Such an endeavor could proceed ad infinitum, as every word—whether a claim term itself, or the words a court uses to construe a claim term—is susceptible to further definition, elucidation, and explanation."); *cf. Abbott Labs*, 471 F.3d at 1368 (declining to construe a "phrase with numerical exactitude" when such precision was unnecessary to resolve the parties' dispute).

*Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). The parties' proposals diverge. Per Blazer, the function is "to shelter an entrance to said hole." DE 77 at 11. Per CMF, the function is "to reduce the amount of light entering the entrance hole through its entrance." DE 73-1 at 13. The Court lands in the middle. Blazer's proposal would "improperly broaden[ ] the scope of the claimed function by 'reading out' [a] limitation[ ] contained in the claim language." *Lockheed Martin Corp.*, 324 F.3d at 1319. Clearly, the relevant function is not shelter from just anything (*e.g.*, shelter from precipitation where a translucent shield might do). Rather, the shelter must reduce admittance of ambient light. Per the specification, this is the purpose of the shelter and the function it must serve.

On the other hand, CMF's proposed reading—premised on its rejected interpretation of "entrance to said hole"—is unduly restrictive. Defendant proposes a locational limit on the ambient light reduction that the claim does not include. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim."). Essentially, CMF reads the claim as: Means to shelter is provided to reduce admittance of ambient light passing directly through the entrance opening. That is not the function claimed. The element requires a structure that shelters the entrance to reduce admittance of ambient light. There is no express limitation on the locus or trajectory for such reduction.[23] It may well be that a structure that shelters

---

[23] The specification does include a line that "the sheltered entrance hole also prevents ambient light from directly entering the entrance hole[.]" DE 52-2 at col. 5, ll. 29–31. However, this one-off remark, describing a single embodiment, hardly amounts to an act of controlling lexicography. "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citation and quotation marks omitted); *see also id.* at 1366 ("[E]ven where a particular structure makes it 'particularly difficult' to obtain certain benefits of the claimed invention, this does not rise to the level of disavowal of the structure. It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We

Case: 5:17-cv-00430-REW-MAS   Doc #: 108   Filed: 04/17/20   Page: 24 of 37 - Page ID#: 2310

the entryway to reduce admittance of ambient light will reduce admittance directly through the entryway. However, the Court sees no basis for reading an unclaimed spatial or directional limitation into that function. *See Skedco*, 685 F. App'x at 959 ("Absent a clear disavowal or lexicography by a patentee, however, he or she is free to draft a claim broadly and expect the full claim scope."); *Pisony v. Commando Constr., Inc.*, No. W-17-CV-00055-ADA, 2019 WL 928406, at *4 (W.D. Tex. Jan. 23, 2019) ("The Court finds that Defendants are improperly attempting to add a directional limitation to Claim 1 that is unnecessary to properly construe this claim term."). The Court construes the function simply as sheltering the entrance to reduce the admittance of ambient light.

The role of light is important to the efficacy of the trap, and the entrance hole design supports that role. The carpenter bee uses ambient light to navigate. *See* DE 52-2 at col. 2, ll. 66–67. Per the specification and Patent text, the hole geometry and design first draw the bee to the trap. Once in the entrance hole, the relative, brightening light in the plenum (coming from the exit side) draws the bee through the plenum toward the receptacle—the darker entrance yields to the attraction of the brighter exit. "[I]nsects entering the trap follow a path of increasing intensity of ambient light that leads them to the receptacle." DE 52-2 at 2 (abstract); *see also id.* at col 2, ll. 61–62 (noting comparatively greater light from receptacle as "admitted in excess of other sources of light within the trap entrance unit plenum"). The reverse is true. When the bee is in the plenum

---

do not read limitations from the specification into claims; we do not redefine words."). Thus, plain and ordinary meaning controls, and the subject, localized statement likewise fails to persuade the Court that a POSITA would read the relevant claim (addressed to "**ambient** (*i.e.*, surrounding) light" reduction) as inherently limited to direct entry. *Cf. ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088, 1090–91 (assigning error to district court's limiting of "means for receiving . . . uniform resource locators" to "absolute URLs" where "the written descriptions . . . lack[ed] an indication of the patentee's clear intent to limit the term" in that fashion and surrounding claim terms suggested a broader interpretation).

or receptacle, it does not try to backtrack because the ambient light around the receptacle is brighter than the darkness of the plenum and the entrance to the entrance hole. *Id.* at col. 3, ll. 1–3 ("[B]ees . . . only try to escape through the transparent walls of the receptacle and do not attempt to return to the dimly lit trap entrance unit plenum."). This illustrates the importance of the sheltered entrance hole. As the specification well describes, the "sheltered entrance hole [ ] prevents ambient light from directly entering the entrance hole and bees within the trap will not identify the entrance hole as an exit." *Id.* at col. 5, ll. 29–32. The point of the sheltering is reduction of light admittance into the trap entrance unit. The Patent designs the passage to be one-way; the bee enters the entrance hole and "never leave[s]" through the trap entrance. *See* The Eagles, *Hotel California* (Asylum Records 1976).

Next, the Court must "identify the structure described within the specification as performing the claimed function." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1324 (Fed. Cir. 2001). Several corresponding structures apply. However, given the alleged infringing products "Wood Be Gone I & II" (*see* DE 3-2 at 1 & 3-4 at 1), and CMF's concessions as to claim scope,[24] the Court finds only limited construction necessary for purposes of this dispute.

Essentially, the Court must determine whether the specification describes the ceiling of the entrance hole as a structure that performs the claimed function. Here, the written description and attached drawings obviously identify that structure as, in some embodiments, performing the sheltering role. *See, e.g.*, DE 52-2 at figs. 4B & 5B. Nonetheless, CMF contends that the "walls" of the hole "cannot be the *means to shelter* because the hole does not lie between the entrance and

---

[24] CMF acknowledges that both a "roof overhanging the face of the trap having an entrance to an entrance hole" and a trap body, as described in Figure 4B, that "shelter[s] the entrance to the hole from the admittance of ambient light because the sides of the trap entrance unit that possess holes are tapered toward the bottom of the trap by angle β" fall within the claim scope. DE 73-1 at 13, 18.

the ambient light[.]" DE 73-1 at 18 (emphasis in original). Defendant is mistaken. The primary flaw in CMF's analysis stems from reliance on its unduly restrictive "entrance to said hole" construction. Nonetheless, assuming CMF would press the argument notwithstanding the "entrance" construction adopted, the Court would reject it for three reasons.

First, Defendant's basic claim is, given prior constructions, factually and logically inapt. Consider a drinking straw, comprising a hole[25] with opaque plastic boundaries; such "walls" (whether deemed part of the hole or part of the straw) surely serve to reduce admission of ambient light to the straw's interior. Second, CMF seeks to distinguish the substance of the entrance hole's circumference from the body of the trap unit. Yet, it is the trap body that forms the boundaries of the entrance hole. Put differently, there could be no entrance hole without the trap "walls," but such "walls" are part of the trap entrance unit, not the entrance hole. Third, Defendant ignores that the claim calls for a shelter that "reduce[s]" ambient light admission; it does not require a structure that entirely blocks light. *See, e.g.*, DE 52-2 at col. 3, ll. 3–4 (describing a "*dimly lit trap entrance unit plenum*") (emphasis added); *id.* at col. 5, ll. 29–31 ("[T]he sheltered entrance hole also prevents ambient light from *directly entering* the entrance hole[.]") (emphasis added). All this is to say that the Court sees no (evidentiary or logical) reason why the "walls"—*i.e.*, the trap unit exterior panel containing the subject entrance hole—"cannot be the means to shelter[.]" DE 73-1 at 18. Indeed, Figure 4B and the related written description provide for just that. *See* DE 52-2 at col. 6, ll. 36–40 ("The end surfaces of trap entrance unit 4 are cut at angle a between 10 and 60 degrees from vertical and bores 42 are made at angle b between 5 and 90 degrees from horizontal to provide sheltered entrance holes 41."); *compare also id.* at col. 2, ll. 46–49 ("The upward sloping

---

[25] Per at least one mathematician, only one hole. *See* Kevin Knudson, *Drinking Straws: How Many Holes?*, Forbes (Jan. 29, 2018, 3:55 p.m.), https://www.forbes.com/sites/kevinknudson/2018/01/29/drinking-straws-how-many-holes/#2641ddfd74d1.

entrance mimics the preferred entrance style of a natural bee nest while reducing the amount of ambient light entering the entrance hole."), *with id.* at ll. 49–51 (describing an overhanging roof as providing "added shelter"). The specification as to Figure 5 continues this theme: "As depicted in FIG. 5b, entrance holes 511 are bored at angle b between 10 and 60 degrees from horizonal to provide sheltered entrance holes." *Id.* at col. 66, ll. 52–54. The sheltering (the reduction in admittance of ambient light) comes from the configuration and angled bore of the hole itself, which thus is a specified structure in the Patent. The claim and specification well support this construction.

The corresponding structure for performing the claimed function[26] includes, with reference to hole geometry, <u>bores made at an angle between 5 and 90 degrees from horizontal and equivalents</u>.

—    **"means to mount"**

The parties' joint-statement proposals for § 112, ¶ 6 construction of the Claim 10 & 11 term "means to mount" substantially aligned. *See* DE 65 at 7–8. The sole exception was CMF's desire to include "summary language at the beginning of its proposed construction." *See* DE 68 at 9. Defendant withdrew its request for such a preamble. *See* DE 73-1 at 27. The Court finds Blazer's proposal consistent with the intrinsic evidence and § 112, ¶ 6 principles. *See* DE 65 at 7–8.[27] Thus, the Court construes the relevant function as <u>to mount the trap</u> and—finding that the structures

---

[26] Again, <u>sheltering the entrance to reduce the admittance of ambient light</u>.

[27] The Court notes that Defendant's response, though stating that the "Parties appear to essentially" agree, offers a revised function and proposed structure listing for this term. *Compare* DE 65 at 7–8, *with* DE 73-1 at 27. CMF offers no argument to support a shift from the previously agreed means-plus-function construction (as to either the modified function definition or corresponding structures). As the Court previously stated, the defense was free to modify its proposed construction. However, the opportunity for revision did not relieve CMF of the duty to explain the basis for its proposal. The Court sees none. Indeed, the full specification supports Blazer's proposal, which precisely tracks the various mounting structures identified in the specification.

identified in Blazer's initial construction accurately map the corresponding Patent structures—adopts Plaintiff's proposed structure listing. *See id.*

— **"wood or a wood substitute"**

Plaintiff initially argued that "wood substitute" is properly understood as "synthetic wood." *See* DE 65 at 4. Defendant countered that wood substitute means "a non-wood organic material which is similar to wood." *Id.* Blazer's opening brief noted amenability to CMF's construction with one exception. DE 68 at 3. Plaintiff argued there was no basis for importing an "organic" limitation not found in the specification. *Id.* CMF's response shifted gears to argue that the "wood substitute" claim was indefinite.

Section 112, ¶ 2[28] sets the definiteness requirement:

> [W]e read § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter.

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) (citation and quotation marks omitted). To invalidate a claim under this theory, a challenger must clearly and convincingly prove indefiniteness. *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017); *see also* 35 U.S.C. § 282, ¶ 1 ("A patent shall be presumed valid. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.").

---

[28] 35 U.S.C. § 112, ¶ 2 ("The specification shall conclude with one or more claims **particularly pointing out and distinctly claiming** the subject matter which the inventor or a joint inventor regards as the invention." (emphasis added)).

CMF fails in its burden and does not show that the intrinsic evidence would insufficiently guide a POSITA regarding the scope of the "wood substitute" claim. First, the Court notes, again, that CMF itself initially found the term sufficiently definite to provide a proposed definition. *See* DE 65 at 4.[29] The specification provides direction for a POSITA seeking an effective substitute. *See* DE 52-2 at col. 1, ll. 44–46 & 59 ("Sound, undecayed wood without paint or bark is usually selected for nests. . . . They avoid most harder woods."); *id.* at col. 3, ll. 46–47 ("[T]he trap entrance unit may be made from a solid piece of wood or similar material[.]"); *id.* at 2 (providing that the plenum-forming material should admit less ambient light than the receptacle);[30] *see also* Prince Patent at col. 1, ll. 39–43 ("The exterior surface of the solid wall around the hole preferably has a light color, and walls of housing are preferably opaque so that the hole appears dark from outside the housing.").   Further, the prior art teaches that a POSITA would be well-familiar with the concept of a wood substitute. *See, e.g.*, DE 52-19 at 10 ("It should be noted that the carpenter bee trap [ ] need not necessarily be created of wood."); Prince Patent at col. 2, ll. 20–21 (disclosing a "carpenter bee trap that is essentially a rectangular plastic housing"); Gunderman Patent at col. 3, ll. 28–31 ("The housing [ ] may also be made from recycled wood composite, plastic, aluminum, masonry, or any other material that is not repugnant to carpenter bees.").

The use of the word "substitute" is somewhat akin to a term of degree. Claims including such terms "will fail for indefiniteness" if they fail to "provide objective boundaries for those of skill in the art when read in light of the specification and the prosecution history." *Liberty*

---

[29] To be sure, CMF was not, for the reasons previously discussed, bound to its initial construction proposal. However, it is quite another thing for Defendant, itself a purveyor and evident designer of carpenter bee traps, to shift from offering a proposed construction to arguing that a POSITA would be non-plussed when confronted with a term that it initially found definite.

[30] *See Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) (describing the patent abstract as a "potentially helpful source of intrinsic evidence as to the meaning of claims").

*Ammunition, Inc. v. United States*, 835 F.3d 1388, 1396 (Fed. Cir. 2016) (quotation marks omitted). Here, the claim itself provides one such objective boundary, *i.e.*, the substitute replaces wood. If this were not enough, the specification provides further non-subjective contours, *e.g.* opaque,[31] bark-less, unpainted. The prior art teaches that POSITAs might deem a broad array of materials proper substitutes for wood in a trap body. But that fact does not render the claim indefinite; "breadth is not indefiniteness." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017). At bottom, CMF's argument falls well short of clearly and convincingly proving that the legal scope of "wood substitute" is "not clear enough that a [POSITA] could determine whether a particular [material] infringes or not." *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003). Thus, "wood substitute" is not indefinite.

Nonetheless, a question lingers: how to construe "wood substitute"? The Court rejects CMF's initial effort to read an "organic" limitation into this claim. DE 65 at 4.  Defendant does not press this limitation in its response brief, and the Court sees no basis for it in the specification. *Renishaw,* 158 F.3d at 1249 ("Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims.") (internal citations and quotation marks omitted). Given the specification background concerning carpenter bee habits, *see* DE 52-2 at col. 1, and the preferred embodiments, *see id.* at col. 4, ll. 66–67, col. 5, ll. 1–2, the Court finds that a

---

[31] The Patent does not explicitly identify opacity as a marker. Nonetheless, that characteristic is clearly an implicit requirement for the entrance-unit corpus. *See, e.g.*, col. 2 at 58–62 ("[T]he material of the at least one receptacle and optionally the area surrounding the at least one receptacle has **a degree of transparency such that ambient light is admitted in excess of other sources of light within the trap entrance unit plenum**." (emphasis added)). If a material possessing merely "a degree" of transparency permits more ambient light entry than the claimed entrance unit, then the unit must surely be crafted from an opaque substance. Further, and more broadly, the Patent's functionality depends on targeted light attraction. A trap body formed from a non-opaque material would thwart that enabling concept.

POSITA would read "wood substitute" as requiring sufficient similarity to wood to achieve like habitat mimicking benefits.

In this vein, the Court finds Plaintiff's proposed "synthetic wood" construction over-narrow. The two keys, per the specification, are appearance and opacity. Thus, the Court construes "wood substitute" as a non-wood material with appearance, opacity, and hardness similar to that of undecayed, unpainted, debarked wood.[32]

—   **"hole"**

Blazer argues the term "hole" requires no independent construction. CMF contends "hole" means "a tunnel extending through the side or bottom of the trap entrance unit." DE 73-1 at 11. The Court largely agrees with Blazer.

The claim language itself partly refutes CMF's proposed construction. The claim describes the hole as "mimic[king]" a tunnel. DE 52-2 at col. 7, ll. 45. There would be no need for mimicry if the hole was, itself, a tunnel (a term that CMF does not attempt to define). The Court agrees that the described hole "must logically have an entrance and an exit" (DE 73-1 at 11); not because the patent defines it as a tunnel, but because the claim says so: "said hole extending from outside of the trap unit to a plenum interior[.]" DE 52-2 at col. 7, ll. 47–48. The from/to description means that the entrance begins at the exterior of the trap unit; the exit terminates in the described plenum. A construction duplicating definitional elements that the claim already provides is unnecessary.

---

[32] *See Skedco*, 685 F. App'x at 959 ("Absent a clear disavowal or lexicography by a patentee, however, he or she is free to draft a claim broadly and expect the full claim scope."); *cf. Anchor Wall*, 340 F.3d at 1311 ("[T]erms such as 'approach each other,' 'close to,' 'substantially equal,' and 'closely approximate' are ubiquitously used in patent claims and [ ] such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts[.]") (describing/quoting *Andrew Corp v. Gabriel Elecs. Inc.*, 847 F.2d 819, 821–22 (Fed. Cir. 1988)).

Further, CMF offers nothing more than conclusory assertions for any locational limitation, *i.e.*, "extending through the side or bottom of the trap entrance unit." DE 73-1 at 11–12. The patent claims define "hole" at length: The "hole" must be drilled "through" the "trap entrance unit"; it must be "sized to mimic a natural carpenter bee nest tunnel"; it must "extend[ ] from the outside of the trap unit to" the plenum interior; finally, it must be "configured to extend substantially horizontally or at an upward angle[.]" DE 52-2 at col. 7, ll. 47–48. The Court already construed many of these defining descriptors. The claim text does not support CMF's efforts to insert additional limitations. *Phillips*, 415 at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."); *see also Unwired Planet*, 829 F.3d at 1358 (finding district court erred in reading an unexpressed limitation on "the manner in which voice is to be transmitted" into the term "voice input[,]" even though "the only embodiments disclosed" utilized that transmission method). The Court sees no need to provide (and CMF fails to justify) a more granular interpretation of a term the full claim (as construed here) so thoroughly defines. *See, e.g.*, *W.E. Hall Co. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1350 (Fed. Cir. 2004) ("'Single piece' is sufficiently clear to make even resort to the dictionary unnecessary."); *U.S. Surgical*, 103 F.3d at 1568 (Claim construction "is not an obligatory exercise in redundancy."). "Hole" is a "commonly used term[,]" and CMF has failed to show it has any "special meaning in the art" (independent of the already defined surrounding terms). *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015). Accordingly, the Court finds the "plain and ordinary meaning . . . clear" and declines further construction. *Id.*[33] The parties' agreement that a hole is equivalent to an opening adds further confirmatory context.

---

[33] Of course, if at some point construction appears necessary to resolve the underlying dispute, the Court may revisit this topic. *See GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1372 (Fed. Cir. 2016) ("In *O2 Micro*, we held that "[w]hen the parties present a fundamental dispute regarding the scope

—      **"configured to receive a clear or translucent receptacle"**

The parties agreed that a "receptacle adapter" is "[a] connector for joining a receptacle to the trap[,]" and the Court has adopted the joint construction. DE 65 at 3. Given that definition, Blazer contends the phrase "configured to receive a clear or translucent receptacle" (DE 52-2 at col. 7, ll. 54–55) needs no further construction. CMF contends the subject language further defines receptacle adapter as being "affixed to the bottom of the trap which receives and holds a receptacle." DE 73-1 at 26. CMF fails to explain why the receptacle adapter need be "affixed[,]" rather than, for instance, part and parcel of the trap unit. *Cf. In re Papst Licensing Digital Camera Patent Litig.*, 778 F.3d 1255, 1262 (Fed. Cir. 2015) (finding district court erred in relying on the phrase "['] attached' to an interface device" to foreclose "permanently attached" devices).

The language preceding the disputed phrase provides the locational limitation CMF attempts to read into the subject clause. *See* DE 52-2 at col. 7, ll. 52–55. The "receives" portion of CMF's proposal supplies nothing not already included in the text. As to "holds," that limitation is neither inherent nor implicit in the claim text. *Skedco*, 685 F. App'x at 959 ("Claim construction must begin and remain centered on the claim language."). **Dependent** Claims 4 & 5 address holding limitations. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."). The Court rejects CMF's proposed construction as "erroneously read[ing] limitations into the claims[.]" *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed.

---

of a claim term, it is the court's duty to resolve it." 521 F.3d at 1362. . . . This duty, however, is not without limit. Where a district court has resolved the questions about claim scope that were raised by the parties, it is under no obligation to address other potential ambiguities that have no bearing on the operative scope of the claim.").

Cir. 2012). Further, in light of the agreed receptacle adapter construction, the Court concludes that the "configured" phrase terms "have plain meanings that do not require additional construction." *Id.* That resolves the parties' dispute on the scope of this limitation. *See id.*[34]

> — **"receptacle adapter . . . is adapted so as to allow at least some ambient light to enter the interior of the trap entrance unit via the exit opening"**

Concerning the already defined "receptacle adapter"—again, <u>a connector for joining a receptacle to the trap</u>—CMF argues that the Claim 13 subsequent limitation "adapted so as to allow at least some ambient light to enter the interior of the trap entrance unit via the exit opening" renders the full phrase a means-plus-function claim. Given the absence of the word "means," § 112, ¶ 6 "will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1348 (quotation marks and alterations omitted). Put differently, and to repeat, "[m]eans-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips*, 415 F.3d at 1311. The subject claim recites a structure with an agreed definition. CMF, however, argues that the relevant structure is a "modified receptacle adapter." DE 73-1 at 28. Defendant's argument is baseless.

First, the word "modified" does not appear in the claim. Second, the balance of the claim simply defines a function the subject "receptacle adapter" performs. CMF fails to explain why the added functional description divests the receptacle adapter of its otherwise undisputedly definite structure. *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir.

---

[34] Notably, CMF agrees that this term should be construed consistent with its plain and ordinary meaning. *See* DE 73-1 at 26. Thus, this is not a scenario like *O2 Micro*, where the parties dispute "not the *meaning* of the words themselves, but the *scope* that should be encompassed by this language[,]" 521 F.3d at 1361; quite the opposite. The Court rejects Defendant's proposed interpretation as entirely divorced from plain and ordinary meaning.

2012) ("In common parlance, the phrase 'adapted to' is frequently used to mean 'made to,' 'designed to,' or 'configured to,' but it can also be used in a broader sense to mean 'capable of' or 'suitable for.'"). The claim identifies definite structure; the fact that it also provides a function that structure must, in context, accomplish does not render it a standalone functional claim. *Phillips*, 415 F.3d at 1311 ("Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function.").

CMF next argues that the specification lacks discussion of any modifications to the receptacle adapter. *See* DE 73-1 at 29. Defendant then rebuts its own argument by identifying three specified iterations of the adapter structure. *Id.* Logically, at least two of these receptacle adapters are "modified" from another version. The Court cannot discern CMF's point. In any event, Defendant, with this desultory contention, plainly fails to show that this claim lacks a definite structure. CMF's final argument—concerning the need for distinct constructions for "exit opening" and "receptacle adapter"—is, in the context of the overarching § 112, ¶ 6 theory, off topic and warrants no further discussion.

The failed § 112, ¶ 6 argument eliminates CMF's sole proposed construction of the subject limitation. Plaintiff argues no construction is required. The included terms "ambient light" and "receptacle adapter" have been construed. In this context and for now, the Court declines further construction.[35]

*Hearing Necessity*

---

[35] *See Pisony*, 2019 WL 928406, at *5 (rejecting defendants' proposed construction, declining further construction, and distinguishing *02 Micro*: "The situation is different here, the Court is simply rejecting Defendants' proposed construction (which substitutes twenty-nine words in an effort to better explain a claim term that is eleven words) rather than refusing to decide between two competing proposed constructions.").

Judge Reeves previously reserved ruling on the need for a *Markman* hearing. DE 43 at 2.

Per the Federal Circuit:

> *Markman* does not require a district court to follow any particular procedure in conducting claim construction. It merely holds that claim construction is the province of the court, not a jury. To perform that task, some courts have found it useful to hold hearings and issue orders comprehensively construing the claims in issue. Such a procedure is not always necessary, however. If the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all the other issues presented by the parties. District courts have wide latitude in how they conduct the proceedings before them, and there is nothing unique about claim construction that requires the court to proceed according to any particular protocol. As long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best.

*Ballard Med. Prod. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001). The Court, for now, sees no need for a claim construction hearing. Instead, the Court finds that any further disputes concerning proper construction would be more efficiently addressed in the context of summary judgment briefing. *See City of Aurora, Colo. ex rel. Aurora Water v. PS Sys., Inc.*, No. CIVA07CV-02371WYDBNB, 2008 WL 2811789, at *1 (D. Colo. July 18, 2008) (explaining that *Markman* hearings "are not required by the Federal Rules of Civil Procedure or even the *Markman* decision," and noting that "such procedures can create a great deal of unnecessary work for the Court and parties").

## IV.   CONCLUSION

For the reasons, to the extent, and on the terms stated the Court preliminarily **ADOPTS** the preceding claim constructions. The Court notes that fact discovery has long been closed in this matter. *See* DE 43 (adopting, in significant part, DE 26). To put this case on track for resolution and establish a clear scheduling baseline, the Court **ORDERS** as follows:

1. The Court **ADOPTS** the deadlines established in DE 26 at ¶¶ 6, 8(d), for expert discovery and dispositive motion practice (these deadlines attach relative to this Order's filing date);

2. The Court **ORDERS** the parties to file a joint status report (not to exceed 3 pages) **within 10 days** addressing, at minimum, the following topics:

   a. The parties' estimate of the time necessary to file pretrial motions following the Court's resolution of any dispositive motions;

   b. The parties' belief(s) as to whether the matter is suitable for some form of alternative dispute resolution and any proposed timing; and

   c. The parties' estimate as to the likely length of trial and dates mutually convenient for trial.

3. The Court **SETS ASIDE** the DE 43, ¶ 10 private mediation limitation;

4. The Court **DIRECTS** the Clerk to assign this matter to an appropriate United States Magistrate Judge for this Division and docket for purposes of;

   a. Generally managing expert discovery, including resolving all discovery disputes (subject to DE 43, ¶ 2's resolution protocol); and

   b. Conducting a settlement conference, if warranted, in the view of the Magistrate Judge, by (1) the parties' joint motion indicating a desire for a court-conducted settlement conference instead of a private mediation, (2) the economics and particulars of the case, and (3) the likelihood of an efficient resolution.

This the 16th day of April, 2020.



Signed By:

_Robert E. Wier_

**United States District Judge**